IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

05 - 22852

CIV - COOKE

MAGISTRATE JUDGE
BROWN



THE REPUBLIC OF HAITI and
TELECOMMUNICATIONS D'HAITI
S.A.M.,

      Plaintiffs,

v.

JEAN-BERTRAND ARISTIDE,
FAUBERT GUSTAVE,
RODNEE DESCHINEAU,
LESLY LAVELANET,
FRED BELIARD
ALPHONSE INEVIL,
JEAN RENE DUPERVAL,
ADRIAN CORR, and
MONT SALEM MANAGEMENT, LTD.,

      Defendants.

CIVIL ACTION NO:

JURY TRIAL DEMANDED

---

Plaintiffs The Republic of Haiti ("Haiti") and Telecommunications d'Haiti S.A.M.

("Teleco") complain against defendants and allege as follows:

## I.    INTRODUCTION

1.    This is a civil action to account for wrongs to, and recover money stolen from, the

people and Government of Haiti by the former President of Haiti, Jean-Bertrand Aristide

("Aristide"), and others acting in concert with him.  As President of Haiti, Aristide abused his

power and deceived and betrayed the Haitian people by directing and participating in ongoing

and fraudulent schemes to:  (a) loot the public treasury and launder the illicit proceeds; (b) divert

and steal revenues rightfully belonging to the Haitian national telephone company; and (c)

1



encourage, protect, participate and profit from illegal drug trafficking in and through Haiti. Through these activities, Aristide and his accomplices converted to their own use millions of dollars of public funds, breached duties of loyalty owed to the people and Government of Haiti, and conducted the affairs of the Government of Haiti and the national telephone company through a pattern of criminal racketeering activities, including violations of the federal wire fraud, money laundering and transportation of stolen property statutes.

2.       Aristide was elected President of Haiti for a five-year term from February 1991 to February 1996.  In September 1991, he was forced into exile by a military coup, led by generals Raoul Cedras and Philippe Biamby.  In September 1994, a U.S.-led force acting under a U.N. resolution invaded Haiti to oust the military regime and restore the Aristide presidency.  Shortly thereafter, Aristide returned to Haiti to serve the remainder of his first term, which ended in February 1996.

3.       From February 1996 to February 2001, Aristide's associate and former Prime Minister, Rene Preval ("Preval"), whom Aristide referred to as his "twin," served as President of Haiti.  Also in 1996, Aristide founded Lafanmi Lavalas, a new political party that Aristide controlled and to which he was appointed "President and sole National Representative."  During Preval's term as President, Aristide continued to function as the *de facto* President of Haiti, through Preval, Lafanmi Lavalas and others.

4.       In February 2001, after disputed elections in which international observers noted extensive incidents of fraud, and which the Organization of American States' electoral-observation mission refused to certify, Aristide again became President.  Aristide's rule was thereafter increasingly marked by political and police corruption, violence—including murder—

2

against opposition party members and journalists, and the brutal suppression of human rights. On or about February 29, 2004, amidst both domestic and international criticism and protests regarding his rule, Aristide resigned and fled to safety in the Central African Republic. He currently resides in the Republic of South Africa.

5.     As President of Haiti, and to a certain extent during the interregnum rule of Preval, Aristide controlled virtually all of the valuable assets of the Government of Haiti. These assets included funds of the Haitian Government and the Central Bank; entitlements to foreign economic assistance, including assistance from the U.S.; the right to grant employment by the Government of Haiti; the right to decide who would do business with the Government of Haiti; and the right to decide who could do business in Haiti, through the granting of licenses, concessions, permits, franchises, and monopolies.

6.     From 2001 or earlier, and continuing at least until February 2004, Aristide, with the assistance and cooperation of government officials and others hand-picked by him for this purpose, used his power to conduct a campaign of looting against the public treasury and the Haitian people by repeatedly directing government agencies to falsely claim that they needed to expend public funds for legitimate purposes and then, as intended, converting those funds, in whole or in part, to the benefit of himself and/or his supporters, family, friends or other accomplices.   The misappropriated funds were frequently diverted and laundered through fictitious companies, established for this purpose by Aristide and his accomplices, both in Haiti and the United States. In all, Aristide and his accomplices stole tens of millions of dollars from the public treasury and transferred a portion of those funds to the United States.

7.     Over the same time period, Aristide, once again with the assistance of government

3

officials he had appointed for this purpose and others, diverted to the benefit of himself and others revenues rightfully belonging to plaintiff Teleco, the Haitian national telephone company. In order to do this, Aristide installed his accomplices in management positions within Teleco, and Aristide and those accomplices then caused Teleco to enter into agreements with certain U.S. and Canadian telecommunications carriers, granting them significantly reduced rates for services provided by Teleco in exchange for kickbacks, which further reduced those rates. Teleco revenues were the principal source of urgently needed foreign currency for Haiti. As a result of the scheme, Haiti and Teleco received only part of the telecommunications revenue to which they were entitled.

8.      Also in exchange for bribes and kickbacks, Aristide and his accomplices provided safe passage for transshipments of illegal drugs to the U.S. and appointed drug traffickers to important posts in the security services of the Haitian Government, from which they could ensure the safety of their trafficking operations. As a direct result of these actions, by 2004 some 20 percent of the cocaine entering the U.S. came through Haiti – a fourfold increase during Aristide's rule. To facilitate his deception, Aristide and his accomplices continued during this time to publicly voice strong opposition to any form of drug trafficking in Haiti.

9.      Aristide not only abused his official power but completely betrayed his trust to the Republic of Haiti and the Haitian people. In assuming the Presidency, Aristide took an oath promising "*faithfully to observe and enforce the Constitution and the laws of the Republic, to respect and cause to be respected the rights of the Haitian people, [and] to work for the greatness of the country* . . . " Aristide instead looted, deceived and betrayed the Haitian people. He stole millions from the public treasury, thereby literally depriving the people of Haiti of the

4

ability to feed themselves.  He laundered millions of dollars of such funds in the U.S. and elsewhere in order to enrich himself and his associates, and to maintain himself in power, while depriving his government of funds that were desperately needed to satisfy the most basic needs of the poorest country in the Western Hemisphere.

10.     The fraudulent schemes orchestrated by Aristide against the people and the Government of Haiti were in many ways connected to and conducted in the United States. Aristide and his accomplices set up fictitious and shell companies in the U.S. to serve as fronts for the interests of Aristide and his co-conspirators and accomplices, transferred stolen public funds to and through those front companies as well as legitimate U.S. companies, used the accounts of U.S. companies in Haiti and made extensive use of the U.S. banking system to assist in the laundering and conversion of public funds.  Further, Aristide and his accomplices demanded and received substantial bribes and kickbacks from U.S. telecommunications carriers, which were wire transferred from U.S. banks, and profited from drug trafficking in and with the United States.

11.     The Republic of Haiti and Teleco now seek redress for these grievous wrongs in the form of treble damages for violations of the federal and state anti-racketeering statutes, compensatory and punitive damages for theft, conversion, fraud and breach of fiduciary duty, and equitable relief in the form of an accounting, the imposition of a constructive trust and the entry of a permanent injunction against Aristide and the other defendants.

## II.     JURISDICTION

12.     Claims for Relief One through Four of this Complaint allege violations of federal law, viz., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

et seq. This Court has jurisdiction over these claims for relief pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. Claims Five through Thirteen allege violations of state and foreign law and of federal common law. This Court has jurisdiction over Claims -Five through Thirteen in that plaintiffs' right to relief arise under the federal common law because this is an action brought by a foreign government against, among others, its former head of state, which implicates important and exclusive concerns of federal law. Moreover, jurisdiction obtains under 28 U.S.C. § 1331 in that plaintiffs' right to relief, to the extent certain of its claims are based on state-created causes of action, necessarily depends on resolution of substantial questions of federal law. Alternatively, this Court has jurisdiction over Claims Five through Thirteen under 28 U.S.C. § 1367.

### III.   VENUE

13.    Venue of this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) to the extent defendants Lesly Lavelanet, Fred Beliard and Jean Rene Duperval reside in this District. Additionally, venue of this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, in this District. Additionally, venue of this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(d) in that all of the defendants are aliens. Venue further obtains pursuant to 18 U.S.C. § 1965(a), because the defendants, including Aristide, Faubert Gustave, Rodnée Deschineau, Lesly Lavelanet, Fred Beliard, Alphonse Inevil, Jean René Duperval, Adrian Corr, and Mont Salem Management , Ltd. reside, are found, have agents, or transact their affairs in this judicial district, and, pursuant to 18 U.S.C. § 1965(b), because the ends of justice require that the defendants be

6

brought before this Court.

## IV.    THE PARTIES

14.    Plaintiff Haiti is a sovereign state recognized by the Government of the United States of America. Haiti and its people were formerly subject to the rule of defendant Aristide and the course of self-dealing and corruption that characterized his abuse of power. Plaintiff has standing to bring this complaint and sues:  (a) in its own right, as the victim of defendants' unlawful schemes, conspiracies, and acts of racketeering; and (b) in a *parens patriae* capacity as the representative of its people, who were victimized by defendants' unlawful schemes, conspiracies, and acts of racketeering.

15.    Plaintiff Teleco is a telecommunications company owned by the Government of Haiti. At all times herein relevant, Teleco owned and operated the only wire-line telephone network in Haiti, and calls made from outside Haiti to persons in Haiti could be lawfully "terminated," *i.e.*, received and delivered to their intended recipients in Haiti, only by Teleco. As alleged above, plaintiff Teleco was victimized by defendants' fraudulent scheme to steal its revenues.

16.    As alleged above, Aristide was President of Haiti from February through September 1991, and again from February 2001 through February 2004. Aristide fled Haiti on or about February 29, 2004, and now resides in the Republic of South Africa.

17.    Defendant Faubert Gustave ("Gustave") is a Haitian national who served as Minister of the Economy and Finance under Aristide from February 2001 to February 2004. As described in more detail below, Gustave routinely directed, and otherwise caused, millions of dollars of Haitian public funds to be transferred either to accounts maintained by U.S. companies

7

in U.S. banks, or to Haitian shell companies with the understanding that they, in turn, would transfer the stolen proceeds to accounts maintained by U.S. companies at U.S. banks. Gustave fled Haiti in on February 29, 2004, the same day that Aristide fled and, on information and belief, currently resides in Sarasota, Florida.

18.    Defendant Rodnée Deschineau ("Deschineau") is a Haitian national who served as the General Manager of the *Banque Populaire Haïtienne* ("BPH"), a commercial bank owned by the Government of Haiti, from about February 2001 to about March 2004. Deschineau was appointed to that position by Gustave. As described in more detail below, Deschineau, acting in concert with and at the direction of Aristide and/or Gustave, routinely transferred (or directed others to transfer) millions of dollars of Haitian public funds either to accounts maintained by U.S. companies at U.S. banks, or to fictitious Haitian companies with the understanding that they, in turn, would transfer the stolen proceeds to accounts maintained by U.S. companies at U.S. banks. Deschineau fled Haiti in about March 2004 and, on information and belief, currently resides in Dorchester, Massachusetts.

19.    Defendant Lesly Lavelanet ("Lavelanet") is a Haitian national and the brother-in-law of defendant Aristide's wife, Mildred Trouillot Aristide. He controlled several companies, including Digitek, S.A. and Global Spectrum, S.A., that have received and, in some instances, have further transferred, stolen Haitian funds. On information and belief, Lavelanet currently resides in Coral Springs, Florida.

20.    Defendant Fred Beliard ("Beliard") is a Haitian national who has been involved in various business relationships with defendant Gustave. Beliard was a participant in the scheme to misappropriate Teleco profits by granting certain U.S. and Canadian telecommunications

8

carriers significantly reduced rates for services provided by Teleco in exchange for kickbacks paid to Aristide and his accomplices.  On information and belief, Beliard currently resides in Cooper City, Florida.

21.     Defendant Alphonse Inevil ("Inevil") is a Haitian national who served as the Director of Planning at Teleco from about February 1997 to June 2003, and then Director General of Teleco from about July 2003 to March 2004.  As Teleco's Director General, Inevil assisted and participated in the scheme to misappropriate Teleco profits. Inevil fled Haiti at or near the time that Aristide fled in February 2004, and formally resigned his post as Director General of Teleco on March 25, 2004 while abroad "*pour des raisons de santé*" (for health reasons).  On information and belief, Inevil currently resides in Lakeland, Florida.

22.     Defendant Jean Rene Duperval ("Duperval") is a Haitian national who served as the Director for International Affairs for Teleco from about June 2003 to about April 2004.  In that capacity, Duperval also assisted and participated in the scheme to misappropriate Teleco profits.  On information and belief, Duperval currently resides in Miramar, Florida.

23.     Defendant Adrian Corr ("Corr") is a citizen and resident of the Turks and Caicos Islands and is a member of the law firm of Miller, Simons and O'Sullivan located in the Turks and Caicos Islands.  In order to facilitate and carry out the scheme to misappropriate Teleco profits, Corr established and administered an entity called Mont Salem Management, Ltd., which was used to receive and distribute kickbacks and bribes paid by U.S. and Canadian telecommunications carriers to defendant Aristide and his accomplices.

24.     Defendant Mont Salem Management, Ltd. ("Mont Salem") is a company existing and organized under the laws of the Turks and Caicos Islands whose principal place of business

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

in located in the Turks and Caicos Islands. As alleged above, Mont Salem, under the direction of Corr, was used to receive and distribute kickbacks and bribes paid to Aristide and his accomplices.

## V.    FACTUAL ALLEGATIONS

### A.    Looting of the Public Treasury and Laundering of the Proceeds

25.    Haiti was established as a republic in 1804. The Government of Haiti (the "Government of Haiti") was established in its present form according to the Haiti Constitution of 1987 (the "Constitution") and at all times herein relevant has been recognized by the United States of America.

26.    Under the Constitution, the Government of Haiti includes a legislative branch, an executive branch, and a judicial branch. Executive power is vested in the President of the Republic (the "President"), who is the head of state and officially resides in the National Palace in the capital, Port-au-Prince. All officers and employees of the executive branch serve at the pleasure of the President and under his direction.

27.    As alleged above, Aristide served as President of Haiti from February 1991 to February 1996 (part of which time he was in exile), and from February 2001 to February 2004. During those periods, except for the time he was in exile, Aristide maintained and exercised complete control over the officers, employees and activities of the executive branch of the Government of Haiti. Aristide also effectively maintained such control during the intervening Presidency of Preval.

28.    The executive branch of the Government of Haiti also includes the Office of the Private Secretary to the President, the General Administration of the National Palace, and the

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

Ministry of the Economy and Finance.

29.     The Office of the Private Secretary to the President (the "Office of the Private Secretary"), headed by the Private Secretary to the President (the "Private Secretary"), provides administrative support for the President. The operations of the Office of the Private Secretary are funded in part by a U.S. dollar account maintained at the Bank of the Republic of Haiti ("BRH"), the central bank owned and operated by the Government of Haiti (the "Private Secretary Account at BRH"). During some or all of the period from February 2001 to February 2004, Ginette Céant ("Céant") served as the Private Secretary, Dominique G. Boyer ("Boyer") as personal secretary and Marie Carmel Latouche ("Latouche") as Economic Counselor to the President, all as part of the Office of the Private Secretary. While serving in those offices, Céant and Latouche had signature authority over the Private Secretary Account at BRH.

30.     The General Administration of the National Palace (the "General Administration"), headed by the Chief Administrator of the National Palace (the "Chief Administrator"), is responsible for maintaining and operating the National Palace and providing security for the President. The operations of the General Administration are funded in part by a U.S. dollar account maintained at BRH (the "General Administration Account at BRH") and by an additional National Palace Function account at BRH (the "National Palace Function Account at BRH"). During some or all of the period from February 2001 to February 2004, Fritz Denis ("Denis") served as the Chief Administrator, Jacques Debrosse ("Debrosse") served as General Administrator of the National Palace, and Jean Hilbert Lebrun ("Lebrun") and Varnet Saint Jean ("Saint Jean") were also employed by or associated with the General Administration. While serving in those offices, Denis, Debrosse, Lebrun and Saint Jean had signature authority over the

11

General Administration Account at BRH and the National Palace Function Account at BRH.

31.     The Ministry of the Economy and Finance (the "Ministry of Finance"), headed by the Minister of the Economy and Finance (the "Minister of Finance"), is responsible, among other things, for the approval of disbursements of public funds from the public treasury, maintained at BRH, including disbursement of funds into the Private Secretary Account at BRH and the General Administration Account at BRH.  The operations of the Ministry of Finance are funded in part by a U.S. dollar account maintained at BRH (the "Finance Ministry Account at BRH").  During some or all of the period from February 2001 through February 2004, defendant Gustave served as Minister of Finance.

32.     The Government of Haiti also owns and operates BPH, a commercial bank, which is by law subject to the control and supervision of BRH.  The General Manager of BPH is appointed by the Minister of Finance.  During the period from February 2001 to February 2004, defendant Deschineau served as the General Manager of BPH, having been appointed to that position by defendant Gustave.

33.     Starting no later than February 2001 and continuing until at least February 2004, Aristide, Gustave, Deschineau and Lavelanet, with the cooperation and assistance of others, including without limitation Céant, Boyer, Latouche, Denis, Debrosse, Lebrun and Saint Jean, knowingly and intentionally participated in an ongoing and fraudulent scheme to loot the public treasury of Haiti and to deprive Haiti and its people of the honest services of their government officials by:

a.     Obtaining transfers of public funds from the public treasury to private entities and to the Private Secretary and General Administration Accounts at BRH,

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

and from the Private Secretary and General Administration Accounts at BRH to private entities by fraudulently misrepresenting that those funds were needed and would be used for legitimate and properly-authorized public purposes;

b.      Transferring the stolen public funds by wire so as to launder them through U.S. companies and/or U.S. banks;

c.      Converting the stolen and laundered funds to the benefit of Aristide and/or his supporters, friends, family and other accomplices (the "Aristide Group"); and

d.      Fraudulently concealing the facts concerning those transactions by means including without limitation the removal and/or destruction of documents.

34.     This fraudulent scheme was carried out in part by using a series of shell or fictitious Haitian companies, each of which served as a front for the interests of the Aristide Group and maintained an account or accounts at BPH (the "Haitian Front Companies"). The Haitian Front Companies included without limitation the following: VJLS Computer Services and Accessiores ("VJLS"), S.A., Se Pa'n Provisions Alimentaires ("Se Pa'n"), Quisqueya Store ("Quisqueya"), Global Spectrum, and Fondation Aristide pour la Democracie ("Fondation Aristide").

35.     In order to use the Haitian Front Companies and their accounts at BPH (the "Front Company Accounts") in furtherance of the fraudulent conspiracy, and at all times acting at the direction of and in concert with Aristide:

a.      Gustave appointed defendant Deschineau as the General Manager of BPH and, contrary to law, gave                her unrestricted authority to

13

control the affairs of BPH and, in particular, to control deposits into, transfers between and disbursements from the Front Company Accounts;

b.     Latouche and Céant signed many checks totaling millions of dollars drawn on the Private Secretary Account at BRH that were simply made to the order of "BPH," without specifying any payee; Deschineau endorsed or directed others to endorse those checks on behalf of BPH and thereafter determined into which of the Front Company Accounts those checks would be deposited, sometimes even splitting a single check among the accounts of several different companies;

c.     Latouche and Céant signed checks drawn on the Private Secretary Account at BRH that were made to the order of one of the Haitian Front Companies but Deschineau deposited those checks into the Front Company Account of a different company;

d.     Deschineau on many occasions transferred funds between Front Company Accounts by writing memos falsely representing that the holder of the account had requested such a transfer;

e.     Deschineau on many occasions withdrew cash from Front Company Accounts by writing memos falsely representing that the holder of the account had requested such a withdrawal;

f.     Latouche and Céant signed many checks totaling more than $3 million dollars drawn on the Private Secretary Account at BRH that were made out to "cash"

14

and, on information and belief, at least some of the proceeds of those checks were deposited into one or more of the Front Company Accounts.

36.    In some cases, defendants transferred stolen public funds from the Private Secretary Account at BRH to VJLS, one of the Haitian Front Companies, and from there to purported U.S. companies. In other cases, defendants transferred stolen public funds through the Haitian Front Companies and then used those funds to buy rice and other food products in the U.S. from Trujillo and Sons, a U.S. company, which they could resell in Haiti in order to misappropriate the laundered funds. In still other cases, defendants transferred stolen public funds from the public treasury, the Private Secretary Account at BRH or the General Administration Account at BRH directly to the U.S. bank accounts of purported U.S. companies, including Southborder Enterprises, All Trading Company and Giovanna of Miami.

### 1.    Certain Transfers Through VJLS Computer Services

37.    VJLS is a fictitious Haitian corporation supposedly directed by Marie Alice Valin and Sonia Jean-Louis. At all times herein relevant, VJLS used a false address and, on information and belief, served as a front for the interests of the Aristide Group.

38.    At all times herein relevant, VJLS maintained a U.S. dollar account, #30-338, BPH (the "VJLS Account at BPH"). During the period from October 2001 to November 2003, at least 55 checks, representing a total of some $16,447,795 in public funds, were drawn on the Private Secretary Account at BRH and deposited into the VJLS Account at BPH. The checks to VJLS were signed by Latouche and Céant, at the direction of Aristide and/or Gustave. Gustave, at the direction of Aristide, approved transfers of funds from the public treasury into the Private Secretary Account at BRH needed to cover those checks. Deschineau, at the direction of

15

Aristide and/or Gustave, selected those checks for deposit into the account of VJLS and endorsed them accordingly.  Details on the individual checks are as follows:

| Check Date | Check No. | Amount |
|---|---|---|
| 25-Oct-2001 | #28 | 200,000.00 |
| 31-Oct-2001 | #31 | 100,000.00 |
| 4-Dec-2001 | #34 | 200,000.00 |
| 5-Dec-2001 | #36 | 280,000.00 |
| 5-Dec-2001 | #37 | 260,000.00 |
| 5-Dec-2001 | #38 | 240,000.00 |
| 20-Dec-2001 | #40 | 200,000.00 |
| 20-Dec-2001 | #51 | 115,000.00 |
| 4-Jan-2002 | #57 | 325,000.00 |
| 4-Jan-2002 | #58 | 250,000.00 |
| 5-Jan-2002 | #53 | 300,000.00 |
| 5-Jan-2002 | #56 | 150,000.00 |
| 24 Jan 2002 | #59 | 250,000.00 |
| 25-Jan-2002 | #60 | 470,000.00 |
| 25-Jan-2002 | #61 | 450,000.00 |
| 25-Jan-2002 | #62 | 380,000.00 |
| 11-Feb-2002 | #65 | 200,000.00 |
| 11-Feb-2002 | #66 | 300,000.00 |
| 15-Feb-2002 | #67 | 300,000.00 |
| 20 Feb 2002 | #68 | 50,000.00 |
| 25-Feb-2002 | #69 | 562,000.00 |
| 8-Mar-2002 | #71 | 200,000.00 |
| 29 Mar 2002 | #76 | 100,000.00 |
| 10-Apr-2002 | #79 | 100,000.00 |
| 10-Apr-2002 | #80 | 300,000.00 |
| 17-May-2002 | #81 | 100,000.00 |
| 17-May-2002 | #82 | 200,000.00 |
| 12-Jun-2002 | #85 | 100,000.00 |
| 12-Jun-2002 | #86 | 300,000.00 |
| 10-Jul-2002 | #90 | 100,000.00 |
| 11-Jul-2002 | #91 | 300,000.00 |
| 11-Jul-2002 | #92 | 500,000.00 |
| 16-Jul-2002 | #93 | 645,465.00 |
| 13-Jul-2002 | #94 | 600,000.00 |
| 23-Aug-2002 | #100 | 645,465.00 |
| 23-Aug-2002 | #101 | 300,000.00 |
| 23-Aug-2002 | #102 | 562,000.00 |
| 16-Sep-2002 | #103 | 600,000.00 |
| 30-Sep-2002 | #104 | 700,000.00 |

16

| Check Date | Check No. | Amount |
|---|---|---|
| 21-Oct-2002 | #105 | 500,000.00 |
| 23-Oct 2002 | #49 | 100,000.00 |
| 19 Nov 2002 | #106 | 500,000.00 |
| 29-Nov-2002 | #107 | 500,000.00 |
| 26-Nov-2002 | #128 | 700,000.00 |
| 26-Nov-2002 | #129 | 572,876.00 |
| 20-Mar-2003 | #130 | 150,000.00 |
| 12-May-2003 | #133 | 450,000.00 |
| 16-June-2003 | #139 | 300,000.00 |
| 8-Jul-2003 | #141 | 250,000.00 |
| 9-Jul-2003 | #142 | 75,000.00 |
| 10-Jul-2003 | #143 | 175,000.00 |
| 4-Aug-2003 | #147 | 175,000.00 |
| 5-Aug-2003 | Ref #146 | 40,000.00 |
| 5-Aug-2003 | Ref #146 | 4,989.00 |
| 12-Aug-2003 | Ref #150 | 20,000.00 |
| Total | | $16,447,795.00 |

39.     By directing, facilitating and making the transfers of public funds into the VJLS

Account at BPH as described above, Aristide, Gustave, Deschineau, Latouche and Céant

fraudulently misrepresented that those amounts were needed and would be used for legitimate

and properly authorized public purposes, while each knew that some or all of those amounts

would instead be converted to the benefit of the Aristide Group.  Aristide, Gustave, Deschineau,

Latouche and Céant, with the assistance of others, also concealed the fact that some or all of

those funds would be so converted.  By that conduct those persons stole public funds and

deprived Haiti and the people of Haiti of the honest services of their governmental officials.

40.     On January 24, 2002, at the direction of Aristide and/or Gustave, Deschineau

caused VJLS to wire transfer $1,716,450 of public funds from the VJLS Account at BPH to an

account held in the name of "Haffey Corporation" at HSBC Bank in Miami.

41.     Haffey Corporation is a purported corporation which, on information and belief,

17

served as a front for the interests of the Aristide Group. The stolen funds were wire transferred to a U.S. bank account of Haffey Corporation and were then converted, in whole or in part, to the benefit of the Aristide Group.

42.     On January 28, 2002, at the direction of Aristide and/or Gustave, Deschineau caused VJLS to wire transfer $467,171 of public funds from the VJLS Account at BPH to the Chase Manhattan Bank account of Sam Ash Music Store Corp. ("Sam Ash"), a U.S. company, for the purchase of a stadium sound system.

43.     At the direction of Aristide and/or Gustave, Latouche authorized Digitek, to serve as Haiti's agent for the sound system purchase. Digitek was a front for the interests of the Aristide Group. The CEO of Digitek was defendant Lavelanet, the brother-in-law of Mildred Trouillot Aristide, the wife of defendant Aristide.

44.     Although the sound system was apparently delivered by Sam Ash to Haiti, the $467,171 payment to Sam Ash included not only the purchase of the system but also a $67,650 "commission" for Digitek, and an additional "overpayment" of $24,850. On or about February 26, 2002, at Lavelanet's direction, Sam Ash mailed a check to Digitek for those amounts, a total of $92,500. There was no legitimate purpose for the purported "commission" and "refund" payments to Digitek. The $92,500 in stolen public funds was wire transferred to Sam Ash for the purpose of laundering and converting those funds and the mailing of the check from Sam Ash to Lavelanet completed the intended conversion of those funds.

45.     In December 2002, at the direction of Aristide and/or Gustave, Deschineau caused VJLS to wire transfer $171,250 of public funds from the VJLS Account at BPH to a U.S. bank account of All Trading Company, a company incorporated in Florida, which served as a front for

18

the interests of the Aristide Group.

### 2. Transfers to Trujillo & Sons for Purchases of Rice and Other Food Products

46.     Defendants transferred stolen public funds through a number of the Haitian Front Companies and used that money to buy rice and other food products from Trujillo and Sons ("Trujillo"), a Miami food wholesaler, for purposes of laundering and converting those funds. The Haitian Front Companies used for this purpose, among others: (a) VJLS, (b) Se Pa'n, (c) Quisqueya, and (d) Global Spectrum.  Through those companies, a total of at least $2,321,510 was transferred to a U.S. bank account of Trujillo to make the purchases.

47.     On information and belief, most or all of the rice and other food products purchased with public funds from Trujillo was imported to Haiti and sold at a substantial profit, and some or all of the proceeds of those sales were converted to the benefit of the Aristide Group.  Further, as described below, defendants failed to pay substantial customs duties due to Haiti for the rice they imported, and misappropriated those funds as well.

### a. Transfers through VJLS

48.     As alleged in detail above, during the period from October 2001 to November 2003, at least 55 checks, representing a total of about $16,447,795 in public funds, were drawn on the Private Secretary Account at BRH and deposited into the VJLS Account at BPH.  Those transfers were directed, facilitated and made by Aristide, Gustave, Deschineau, Latouche and Céant.

49.     By directing, facilitating and making each of those transfers of public funds into the VJLS Account at BPH, Aristide, Gustave, Deschineau, Latouche and Céant fraudulently misrepresented that those amounts were needed and would be used for legitimate and properly

19

authorized public purposes, while each knew that some or all of those amounts would instead be converted to the benefit of the Aristide Group. Aristide, Gustave, Deschineau, Latouche and Céant, with the assistance of others, also concealed the fact that some or all of those funds would be so converted. By that conduct those persons stole public funds and deprived Haiti and the people of Haiti of the honest services of their governmental officials.

50.     On or about April 18, 2002, at the direction of Aristide and/or Gustave, Deschineau caused VJLS to transfer $400,000 of public funds from the VJLS Account at BPH to account #30-266 maintained by Trujillo at BPH (the "Trujillo Account at BPH") for the purchase of rice and/or other food products, intending that those funds be further transferred to the U.S. to pay for the products and their importation. That same day, Trujillo wire transferred that amount from the Trujillo Account at BPH to an account maintained by Trujillo at Ocean Bank in Miami (the "Trujillo Account at Ocean Bank").

     **b.     Transfers through Se Pa'n and Quisqueya**

51.     During the period from February 2002 to September 2002, in a series of transactions, VJLS transferred about $1.75 million of misappropriated public funds from the VJLS Account at BPH to the Se Pa'n Accounts at BPH. Those transfers were directed by Aristide and/or Gustave and approved and made by Deschineau.

52.     At all times herein relevant, Se Pa'n and Quisqueya were fictitious Haitian companies operated by Ricardo Sanon that served as fronts for the interests of the Aristide Group and as conduits for stolen Haitian public funds. Sanon, a Haitian national, was listed as the Managing Director of these fictitious companies in 2002, when he was a 25-year old student. Se Pa'n and Quisqueya each maintained accounts at BPH (the "Se Pa'n Accounts at BPH" and the

20

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

"Quisqueya Accounts at BPH," respectively).

53.     During the period from October 2003 to January 2004, checks representing a total of about $3.26 million in public funds were drawn on the Private Secretary Account at BPH, the General Administration Account at BPH, the National Palace Function Account at BPH and an account maintained for the Office of the Prime Minister at BPH and deposited into the Se Pa'n and Quisqueya Accounts at BPH. Those checks were signed for the relevant accounts by persons including Latouche, Céant, Debrosse, Denis, Lebrun and Saint-Jean. Gustave, at the direction of Aristide, approved transfers of public funds into those accounts sufficient to cover those checks. Deschineau received and deposited the checks. The details of those transfers are as follows:

    a.      On or about January 23, 2003, a check for 7,000,000 Haitian Gourdes (approximately $182,986) drawn on the National Palace Function Account was deposited into a Quisqueya Account at BPH.

    b.      On or about March 17, 2003, a check for $800,000 drawn on the Private Secretary Account at BRH was deposited into a Quisqueya Account at BPH.

    c.      On or about October 21, 2003, a check for $165,000 drawn on the General Administration Account at BRH was deposited into a Se Pa'n Account at BPH.

    d.      On or about October 21, 2003, a check for $500,000 drawn on the General Administration Account at BRH was deposited into a Quisqueya Account at BPH.

    e.      On or about December 30,                2003, a check for 7,000,000

21

Haitian gourdes (approximately $177,094) drawn on the account for the Office of the Prime Minister at BRH was deposited into a Quisqueya Account at BPH.

f.   On or about January 9, 2004, a check for $725,700 drawn on the General Administration Account at BRH was deposited into a Quisqueya Account at BPH.

g.   On or about January 9, 2004, a check for $623,650 drawn on the General Administration Account at BRH was deposited into a Se Pa'n Account at BPH.

h.   On or about January 9, 2004, a check for 3,000,000 Haitian Gourdes (approximately $85,155) drawn on the National Palace Function Account was deposited into a Quisqueya Account at BPH.

54.   By directing, facilitating and making each of those transfers of public funds into the Se Pa'n and Quisqueya Accounts at BPH, Aristide, Gustave, Deschineau, Latouche, Céant, Debrosse, Denis, Lebrun and Saint-Jean fraudulently misrepresented that those amounts were needed and would be used for legitimate and properly authorized public purposes, while each knew that some or all of those amounts would instead, through the purchase of rice and other food products from Trujillo in the U.S., be converted to the benefit of the Aristide Group. Aristide, Gustave, Deschineau, Latouche, Céant, Debrosse, Denis, Lebrun and Saint-Jean, with the assistance of others, also concealed the fact that some or all of those funds would be so converted. By that conduct those persons stole public funds and deprived Haiti and the people of Haiti of the honest services of their governmental officials.

22

55.     During the period from February 2002 to September 2003, as intended, public funds were transferred from the Se Pa'n and Quisqueya Accounts at BPH to the Trujillo Account at Ocean Bank to purchase rice and/or other food products through a series of transactions described below. The transfers from the Se Pa'n and Quisqueya Accounts at BPH were made at the direction of Aristide and/or Gustave by Deschineau:

a.      On or about February 22, 2002, $415,480 of public funds was transferred from a Se Pa'n Account at BPH to the Trujillo Account at BPH. On information and belief, and as intended, in or about February 2002, Trujillo wire transferred that amount, together with certain other funds, from the Trujillo Account at BPH account to the Trujillo Account at Ocean Bank.

b.      On or about March 5, 2002, $90,000 of public funds was wire transferred from a Se Pa'n Account at BPH to the Trujillo Account at Ocean Bank.

c.      On or about April 3, 2002, $200,000 of public funds was wire transferred from a Se Pa'n Account at BPH to the Trujillo Account at Ocean Bank.

d.      On or about April 10, 2002, $75,000 of public funds was wire transferred from a Se Pa'n Account at BPH to the Trujillo Account at Ocean Bank.

e.      On or about November 13, 2002, $100,000 of public funds was transferred from a Se Pa'n Account at BPH to the Trujillo Account at BPH. On or about December 5, 2002, as intended, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

f.      On or about March 18, 2003, $97,500 of public funds was transferred from a

23

Se Pa'n Account at BPH to the Trujillo Account at BPH. On or about March 20, 2003, as intended, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

g.    On or about March 26, 2003, $21,000 of public funds was transferred from a Se Pa'n Account at BPH to the Trujillo Account at BPH. On or about April 25, 2003, as intended, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

h.    On or about May 28, 2003, $123,930 of public funds was transferred from a Quisqueya Account at BPH to the Trujillo Account at BPH, and on or about May 29, 2003, another $100,000 of public funds was transferred from a Quisqueya Account at BPH to the Trujillo Account at BPH. On or about May 30, 2003, as intended, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

i.    On or about June 18, 2003, $125,100 of public funds was transferred from the Quisqueya Accounts at BPH to the Trujillo Account at BPH. On or about June 20, 2003, as intended, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

j.    On or about September 1, 2003, $417,500 of public funds was transferred from the Quisqueya Accounts at BPH to the Trujillo Account at BPH. On information and belief, as intended, in or about September 2003, Trujillo wire transferred those funds, together with certain other funds, to the Trujillo Account at Ocean Bank.

24

c.      **Transfers through Global Spectrum**

56.      At all times herein relevant, Global Spectrum was a Haitian company controlled by defendant Lavelanet, the brother-in-law of Aristide's wife, Mildred Truillot Aristide, which served as a front for the interests of the Aristide Group.

57.      On or about February 27, 2003, Digitek, which was also controlled by Lavelanet, was paid $239,500 in public funds, through a check drawn on an account of BRH at Citibank, for the purchase of certain equipment that was to be delivered by Digitek to Teleco. On information and belief, Digitek never delivered that equipment and/or other equipment paid for with public funds, to Teleco. Digitek used the proceeds of that check to purchase a CD at BPH for Global Spectrum. In or about October 2003, Global Spectrum transferred $256,000, representing the proceeds of the CD with accumulated interest, from its account at BPH to the Trujillo Account at BPH. From there, those funds were transferred to the Trujillo Account at Ocean Bank.

d.      **Failure to Pay Customs Duties**

58.      Finally, to facilitate the above fraudulent scheme, at least two of the major rice purchasers were allowed to bring their products into Haiti without paying substantial customs duties rightfully due to Haiti. By law, a staples importer must deposit with the Haiti Customs agency a guaranty check that will be cashed if the importer does not pay the required customs duties or else the importer will be placed on a "black list." In accordance with that requirement, during the period from March 2003 through November 2003 importer Dieuseul Tchakounté Joseph ("Tchakounté ") provided to the Customs agency 10 guaranty checks drawn on BPH in a total amount equivalent to over $4 million to cover the import of rice during the period March to October 2003. The checks were funded by a loan from BPH. However, Deschineau, at the

25

direction of Aristide and/or Gustave, instructed that each of the checks be returned to BPH. The checks were re-deposited in Tchakounté's BPH account during the period from April 2003 through January 2004 and then used by Tchakounté to repay his BPH "loan." Although Tchakounté never paid any customs duties, he was never placed on the "black list" because of orders given by Céant and Gustave to the Customs General Manager. As a result of this scheme, the Customs agency, and thus the public treasury of Haiti, were wrongfully deprived of over $4 million in customs duties due and owing on the Tchakounté imports. On information and belief, Tchakounté also paid a kickback to Deschineau in excess of the Gourde equivalent of $200,000 for her complicity in this scheme.

59.     In the case of Global Spectrum, the company controlled by defendant Lavelanet, BPH issued letters of guaranty signed by Deschineau, on behalf of Global Spectrum, even though Global Spectrum did not have the necessary funds on deposit to obtain the letters of guaranty. Although Lavelanet never paid customs duties on his rice imports, the letters of guaranty were returned to BPH. Notwithstanding Lavelanet's failure to pay the customs duties owed, Céant, at the direction of Aristide and/or Gustave, ordered the Director of Customs and other Customs personnel to allow the clearance through customs of Global Spectrum's rice. As a result, the Customs agency, and thus the public treasury of Haiti, were wrongfully deprived of the equivalent of approximately $1.42 million.

### 3.     Direct Transfers to U.S. Companies

#### a.     Southborder Enterprises Ltd.

60.     On October 8, 2003, at the direction of Aristide and/or Gustave, Latouche wrote on the letterhead of the Private Secretary requesting payment from the public treasury of three

26

attached invoices from Southborder Enterprises Limited ("Southborder"). The first invoice was for $575,376 for 18,840 hand-cranked AM/FM radios, the second was for $260,450 for 84,000 t-shirts and the third was for $130,010 for 300,000 bumper stickers and 50,000 pins.

61. Southborder is a fictitious company, and no business by that name has ever operated at the address or phone number listed on the Southborder invoices. There is no number "1362" on NW 58 Street in Miami; the address provided on the Southborder invoices, and the phone numbers provided are not working numbers. On information and belief, Southborder served as a front for the interests of the Aristide Group.

62. At the direction of Aristide and/or Gustave, Boyer approved the payment of the three Southborder invoices. On October 10, 2003, the request was passed on to Gustave requesting as "urgent" the payment of all three invoices. On or about October 14, 2003, at the direction of Gustave, a check was prepared and mailed from BRH to Southborder for $965,836 of public funds, the total of the three invoices.

63. By directing, approving and making the payment of $965,836 to Southborder, Aristide, Gustave, Latouche, and Boyer fraudulently misrepresented that that amount was needed, properly authorized and would be used for the public purposes stated, while each knew that some or all of those amounts or the proceeds thereof would instead be converted to the benefit of the Aristide Group. Aristide, Gustave, Latouche, and Boyer, with the assistance of others, also concealed the fact that some or all of those funds would be so converted. By that conduct those persons stole public funds and deprived Haiti and the people of Haiti of the honest services of their governmental officials.

64. Some or all of the $965,836 mailed to Southborder, or the proceeds thereof, was

27

converted to the benefit of the Aristide Group. The stolen public funds were mailed from BRH to Southborder for the purposes of laundering that money and completing its conversion.

### b.    Giovanna of Miami

65.    On January 24, 2002, at the direction of Aristide and/or Gustave, Debrosse signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $169,322 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to an account of Giovanna of Miami, Inc. at Bank of America (the "Giovanna Account at Bank of America"), in order to pay for equipment that it was represented were necessary and properly authorized to obtain for the Security Police for the National Palace. That same day, the requested wire transfer was made.

66.    Giovanna of Miami was a U.S. company controlled by Michelle Cardozo ("Cardozo"). There is no record of Giovanna of Miami having ever done business at the address listed on its invoices, which is simply a mailbox at a "The UPS Store" in Miami that was rented by Cardozo. A Dun and Bradstreet report for Giovanna of Miami gives as its principal address a residence that, on information and belief, was at one time owned by Michelle Cardozo. Giovanna of Miami was a front for the interests of the Aristide Group.

67.    On April 11, 2002, at the direction of Aristide and/or Gustave, Debrosse signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $204,292 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank of America which it was represented was necessary to pay for musical instruments for the Presidential Security Unit's brass band. That same day, the requested wire transfer was made.

28

68.     On April 23, 2002, at the direction of Aristide and/or Gustave, Debrosse signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $272,847 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank of America. That same day, the requested wire transfer was made.

69.     On May 2, 2003, at the direction of Aristide and/or Gustave, Debrosse and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $26,763 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to an account of Giovanna of Miami at Bank Atlantic in Miami (the "Giovanna Account at Bank Atlantic"). That same day, the requested wire transfer was made.

70.     On July 8, 2003, at the direction of Aristide and/or Gustave, Debrosse and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $162,575 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank Atlantic to pay for equipment for the Security Police for the National Palace. On July 11, 2003, the requested wire transfer was made.

71.     On July 30, 2003, at the direction of Aristide and/or Gustave, Debrosse and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $208,469 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank Atlantic to pay for equipment that it was represented was necessary to obtain for the Presidential Security

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

Unit. That same day, the requested wire transfer was made.

72.     On October 28, 2003, at the direction of Aristide and/or Gustave, Lebrun and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $143,012 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank Atlantic, which letter effectively represented that the funds were necessary to pay for equipment for the Presidential Security Unit. On October 30, 2003, the requested wire transfer was made.

73.     On November 10, 2003, at the direction of Aristide and/or Gustave, Saint-Jean and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $283,220 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank Atlantic, which letter effectively represented that the funds were necessary to pay, once again, for musical instruments for the Presidential Security Unit's brass band. On November 12, 2003, the requested wire transfer was made.

74.     On November 19, 2003, at the direction of Aristide and/or Gustave, Saint-Jean and Denis co-signed a check payable to BRH drawn on the General Administration Account at BRH in the amount of $270,381 and sent it with a letter directing BRH to wire transfer a slightly smaller amount (apparently reduced by the bank's charges) to the Giovanna Account at Bank Atlantic, which letter effectively represented that the funds were necessary to pay for equipment for the Security Police for the National Palace. On November 24, 2003, the requested wire transfer was made.

75.     On January 7, 2004, at the direction of Aristide and/or Gustave, Denis wrote to

30

Gustave requesting $146,313 from the public treasury, which letter effectively represented that the funds were necessary for the purchase from Giovanna of Miami of equipment for the "CAT Team," another unit that provided security for the President. Gustave approved that request and, on or about January 23, 2004, wrote to BRH directing that he transfer that amount from the public treasury into the General Administration Account at BRH. Shortly thereafter, the requested funds were deposited in that account and, on information and belief, the funds were transferred to Giovanna of Miami in the United States.

76.     On or about December 10, 2003, Eddy Civil, a Haitian national associated with the Presidential Security Unit, wrote two memoranda on the letterhead of that unit to the members of the 2004 Commission, an organization in charge of ceremonies planned for the celebration of the 200th anniversary of Haitian independence, requesting approval of two attached invoices from Giovanna of Miami, totaling $129,606, for various items, which memoranda effectively represented that the funds were needed for the bi-centennial celebration, including military cots, Kevlar helmets, handcuffs, belts, shoes, metal detectors, battery packs, holsters, speed loaders and customized pins for foreign VIPs.

77.     Gustave approved of the payment of those invoices and, on December 23, 2003, and again on February 11, 2004, directed BRH to wire transfer $129,606 from the Finance Ministry Account at BRH to the Giovanna Account at Bank Atlantic. Gustave's letter of direction on February 11, 2004 was marked "urgent," notwithstanding the fact that the bi-centennial celebration for which the items ostensibly were needed was over, having taken place on January 1 and 2, 2004, and at the time of the letter Aristide was under siege and preparing to flee Haiti. On February 11, 2004, within an hour of having received the request, the requested

31

wire transfer was made.

78.    By directing, approving and making the payment of the above-described amounts, totaling more than $2 million, to Giovanna of Miami, Aristide, Gustave, Debrosse, Denis, Lebrun, Saint-Jean, and Civil fraudulently misrepresented that those amounts were needed, properly authorized and would be used for the public purposes stated, while each knew that some or all of those amounts, or the proceeds thereof, would instead be converted to the benefit of the Aristide Group.  Aristide, Debrosse, Denis, Lebrun and Saint-Jean, with the assistance of others, also concealed the fact that some or all of those funds would be so converted.  By that conduct those persons stole public funds and deprived Haiti and the people of Haiti of the honest services of their governmental officials.

79.    Some or all of the more than $2 million wire transferred to Giovanna of Miami as described above was converted to the benefit of the Aristide Group.  The stolen public funds were wire transferred from BRH to Giovanna of Miami for the purpose of completing their conversion.

**B.    Diversion of Teleco Revenues**

80.    As alleged above, plaintiff Teleco is a telecommunications company owned by the Government of Haiti and operated as a government monopoly.  At all times herein relevant, Teleco owned and operated the only wire-line telephone network in Haiti, and calls made from outside Haiti to persons in Haiti could be lawfully "terminated," i.e., received and delivered to their intended recipients or to a cellular carrier in Haiti, only by Teleco.  As a result, any foreign telecommunications company wishing lawfully to provide international calling service to Haiti had to arrange, directly or through another carrier, to have its calls to Haiti terminated by Teleco

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

and to pay Teleco for providing that service. International calls terminated by Teleco are routed through Teleco switching equipment that records the international carrier and the duration in minutes for each call, and Teleco generally charges those carriers a per-minute rate for terminating the calls. As a result, Teleco was a major source of desperately-needed foreign currency for Haiti and its people.

81.     During the period from July 2003 to March 2004, as directed by Aristide, defendant Inevil served as the Director General of Teleco. During the period from June 2003 to April 2004, as directed by Aristide, defendant Duperval served as the Director for International Affairs of Teleco.

82.     During the 1980's and the early 1990's, Teleco entered into agreements to terminate calls originating in the U.S. with certain large "Class A" U.S. carriers, such as AT&T, MCI and Sprint. Some of the payments made by those Class A carriers for Teleco's services were deposited into an escrow account set up at Prudential Bache to provide funds to be used by Teleco to upgrade its network and facilities in Haiti. On information and belief, Aristide, while in exile prior to October 1994, received control of tens of millions of dollars from that Teleco escrow account. That money has never been accounted for.

83.     After Aristide's return from exile, and at his direction, Teleco began entering into agreements to provide smaller "Class B" foreign carriers, including U.S. carriers, lower per-minute rates for terminating calls in Haiti than those available to the "Class A" carriers. At various times during the period from 1994 to 2004, the Class B Carriers that received such rate concessions included Fusion Telecommunications, Haiti Direct Access, Cinergy Telecommunications, Uniplex Telecom, Toscana Telecom, Terra/IPIP Communications, Skyytel

33

Ltd., Telsicom, IDT Corporation and IVM Telecom.

84.    In addition, at least some of the Class B carriers were at times allowed effective rate concessions because they were not required to pay the agreed per-minute rate for all of the minutes of their calls terminated by Teleco.  On information and belief, such effective rate concessions were granted by:  (a) allowing certain carriers to route calls around the Teleco switching equipment that records the duration of international calls; (b) altering the switching equipment hardware or software so as to count fewer than all of the minutes for certain carriers; or (c) allowing certain carriers to "settle" allegedly disputed Teleco billings on favorable terms.  The Class B carriers who entered into such "settlements" included Fusion Telecommunications, Cinergy Telecommunications and Terra/IPIP Communications.

85.    The rate concessions granted to the Class B carriers were not in Teleco's economic interest.  Further, by silently accepting those concessions, Class B carriers providing service between the U.S. and Haiti violated U.S. law.  Until at least June 2004, the U.S. Interstate Commerce Commission's International Settlement Policy required telecommunications carriers providing service between the U.S. and Haiti to publish and share the most favorable rates offered by Teleco to any of them.

86.    At Aristide's direction, Teleco also required at least some of the Class B carriers to make their payments for Teleco's services to off-shore companies said to be operating as "agents" or "factors" or "consultants" for Teleco.  Fusion Telecommunications, for example, made at least some of its payments through C.W. Holdings. Cinergy Telecommunications made some of its payments through Toscana Telecom, a British Virgin Islands company. Skyytel Ltd. and IDT Corporation were directed to make their payments to defendant Mont Salem, in the

34

Turks and Caicos Islands. On information and belief, AT&T was asked but refused to make its payments for Teleco's service to such an intermediary.

87.    Starting no later than July 2003, and on information and belief starting much earlier, Aristide, Inevil (and his predecessors in office), Duperval (and his predecessors in office) and defendant Beliard, with the cooperation and assistance of others, knowingly and intentionally participated in an ongoing and fraudulent scheme to steal revenues rightfully belonging to Teleco. Pursuant to and in furtherance of that scheme, those defendants caused Teleco to grant Class B carriers lower rates than they would otherwise have had to pay for Teleco's services, demanded and received in exchange bribes and kickbacks paid to the Aristide Group, in some cases paid by U.S. companies by means of wire transfers, and fraudulently concealed the true facts concerning those transactions, by means including without limitation the removal and/or destruction of documents. By that conduct those persons stole public funds and deprived Haiti and the people of Haiti of the honest services of their governmental officials.

88.    The fraudulent scheme to steal Teleco revenues was carried out in part through defendant Mont Salem. Pursuant to the fraudulent scheme, defendants Corr and Beliard set up Mont Salem, a company in the Turks and Caicos Islands, to serve as a front for the interests of the Aristide Group. At Aristide's direction, Inevil, Duperval and Beliard directed at least two of the Class B carriers, IDT and Skyytel, to make their payments for Teleco's services to Mont Salem. At Aristide's direction, Teleco's then-counsel also caused Teleco to request at least one other Class B carrier, Fusion, to make payments through Mont Salem.

89.    As a result of the fraudulent scheme, plaintiffs Haiti and Teleco were injured both because certain carriers were fraudulently granted reduced rates for Teleco's services or did not

35

otherwise pay for all of the minutes terminated in Haiti and because some of the amounts those carriers did pay went to the Aristide Group in the form of bribes and kickbacks, thereby depriving both Teleco and Haiti of foreign currency that was desperately needed to fund Haiti's economic development and feed its people.

90.     Defendants and their co-conspirators and associates intended to continue the scheme in perpetuity, for example, drafting and executing their contracts with IDT and Fusion so that the agreements were automatically renewable.

### 1.     IDT Corporation

91.     IDT Corporation is a corporation with principal offices located at 520 Broad Street Newark, New Jersey.   At all times herein relevant, IDT has provided international telecommunications services, including service between the U.S. and Haiti.

92.     In October 2003, IDT entered into an agreement with Teleco and Mont Salem under which IDT agreed to pay nine cents per minute for Teleco's services but to make all payments due for those services to Mont Salem as Teleco's "agent."   Aristide and Beliard negotiated that agreement with IDT, and Inevil and Corr signed the agreement on behalf of Teleco and Mont Salem, respectively.   Each of the parties to that agreement understood that Teleco would actually receive only six cents per minute for the services it provided to IDT and that the other three cents per minute would be retained by Mont Salem as a bribe and a kickback paid to the Aristide Group.   On information and belief, it was also agreed that Beliard would receive some share of the three cents.

93.     Inevil and Duperval caused Teleco's records to falsely show that Mont Salem rather than IDT was the carrier and that Mont Salem was to pay at the rate of six cents per

36

minute.  Teleco reasonably relied on the false records, and thereby was deceived into believing that Teleco was entitled to receive only six cents per minute from Mont Salem rather than nine cents per minute from IDT.

94.     Accordingly, for the period from February 2004, when Teleco began providing service to IDT, through April 2004, Teleco invoiced Mont Salem for that service monthly at the rate of six cents per minute.  Those invoices were marked "Mont Salem II" to distinguish the invoices sent to Mont Salem for service provided to Skyytel, which were marked "Mont Salem" or "Mont Salem I."

95.     In or about April 2004, IDT became aware of a suit filed by Michael Jewett, a former IDT employee, alleging, among other things, that IDT had agreed to pay bribes to the Aristide Group through Mont Salem as outlined above.  Shortly after that, IDT stopped making payments to Mont Salem and, at IDT's request, Teleco began billing IDT directly for its services. But because Teleco believed that IDT was paying only six cents per minute, Teleco continued to bill IDT at that rate rather than the nine cent rate until Teleco implemented a rate increase that applied to all carriers in August 2004.

96.     On or about July 6, 2004, the law firm of Latham & Watkins, acting on behalf of IDT's audit committee, sent a letter to Duperval asking to interview him to discuss the dealings between IDT, Mont Salem and Teleco.  In September 2004, apparently as a result of the audit committee's work, IDT sent Teleco a proposed agreement under which, among other things, Teleco would formally terminate any agency relationship with Mont Salem effective as of May 2004, and Teleco would agree not to allow any agent acting on its behalf to make or receive payments in violation of the U.S. Foreign Corrupt Practices Act.

37

97.    On or about August 10, 2004, defendant Corr wrote to Yves Armand, the new Assistant Director General of Teleco, requesting permission to make certain "adjustments" to Teleco's network equipment.  In that letter, Corr falsely represented to Teleco that Mont Salem was a telecommunications carrier and was trying to expand its operations and its infrastructure in the U.S. and Canada.

98.    For service it provided to IDT in the period from February 2004 to April 2004, Teleco invoiced Mont Salem a total of about $605,177, at the rate of six cents per minute.  Mont Salem paid that amount to Teleco by wire transfers in the following amounts and the following months:  (a) March 2004: $73,206, (b) April 2004: $230,085 and, (c) May 2004: $301,884.

99.    On information and belief, IDT made payments by wire transfer to Mont Salem in each of the months listed above in an amount equal to about 50 percent more than the amount listed for each month above, i.e., representing the difference between the rate of nine cents per minute paid by IDT to Mont Salem and the rate of six cents per minute paid by Mont Salem to Teleco.  Accordingly, on information and belief, Mont Salem retained from those payments by IDT, for the service period from February 2004 to June 2004, about $302,588 as bribes and kickbacks for the Aristide Group.

### 2.    Skyytel Ltd.

100.    Skyytel Ltd. is a Canadian company which, at all times herein relevant, provided international telecommunications services, including service between North America and Haiti.

101.    In 2003, Skyytel entered into an agreement with Teleco and Mont Salem under which Skyytel agreed to pay nine cents per minute for Teleco's services but to make all payments due for those services to Mont Salem, as Teleco's "agent."  Each of the parties to that

38

agreement understood that Teleco would actually receive only six cents per minute for the services it provided to Skyytel and that the other three cents per minute would be retained by Mont Salem as a bribe and a kickback paid to the Aristide Group. Defendant Inevil caused Teleco to enter into this agreement with Skyytel.

102. Defendants Inevil and Duperval caused Teleco's records to falsely show that Mont Salem rather than Skyytel was the carrier and that Mont Salem was to pay at the rate of six cents per minute. Teleco reasonably relied on the false records, and thereby was deceived into believing that Teleco was entitled to receive only six cents per minute from Mont Salem rather than nine cents per minute from Skyytel.

103. Accordingly, for the period from August 2003, when Teleco began providing service to Skyytel, through September 2004, Teleco invoiced Mont Salem for that service monthly at the rate of six cents per minute. Those invoices were marked "Mont Salem I" after Teleco began providing service to IDT, in order to distinguish the invoices sent to Mont Salem for service provided to IDT, which were marked "Mont Salem II."

104. For service to Skyytel in the period from August 2003 to June 2004, Teleco invoiced Mont Salem a total of about $2,008,433, at the rate of six cents per minute. Mont Salem paid Teleco $1,744,742 of that amount by wire transfers in the following amounts and the following months:

| MONTH | PAYMENT |
|---|---|
| September 2003 | $51,224 |
| October 2003 | $100,956 |
| November 2003 | $151,395 |
| December 2003 | $160,400 |
| January 2004 | $173,287 |

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

| February 2004 | $168,294 |
| March 2004 | $150,114 |
| April 2004 | $174,306 |
| May 2004 | $199,532 |
| June 2004 | $171,413 |
| July 2004 | $243,822 |
| TOTAL | $1,744,743 |

105.   On information and belief, Skyytel made payments by wire transfer to Mont Salem in each of the months listed above in an amount equal to about 50 per cent more than the amount listed for each month above, i.e., representing the difference between the rate of nine cents per minute paid by Skyytel to Mont Salem and the rate of six cents per minute paid by Mont Salem to Teleco.  Accordingly, on information and belief, Mont Salem retained from those payments by Skyytel, for the service period from August 2003 to June 2004, about $872,371 as bribes and kickbacks for the Aristide Group.

### C.   Drug Trafficking

106.   Starting in about February 2001, defendant Aristide and his accomplices encouraged, protected, participated in and profited from illegal drug trafficking in and through Haiti.  This scheme involved the payment of massive bribes and kickbacks to Aristide and high-level officials in the security and law enforcement agencies of the Haitian Government in exchange for their protection of drug transshipments through Haiti, and in particular of shipments of cocaine intended for sale in the United States.  Aristide and other governmental and police officials acting at his direction repeatedly interfered with and thwarted investigations

40

conducted by the Haitian National Police ("HNP"), who had direct responsibility for Haiti's anti-drug efforts. As a direct result of these actions, by 2004, some 20 per cent of the cocaine entering the U.S. came through Haiti -- a fourfold increase during Aristide's rule.

107. The U.S. Government has indicted a number of drug traffickers, former Haitian police and Haitian Government officials, some of whom have pled guilty to or have gone to trial on, cocaine trafficking and money laundering charges in U.S. courts. These individuals include: (a) Oriel Jean ("Jean"), Aristide's former head of presidential/national security, (b) Evens (Evintz) Brillant ("Brillant"), the former head of the HNP anti-narcotic brigade, (c) Rudy Therassan ("Therassan"), the former commander of the HNP Brigade of Research and Investigation, (d) Jean Nesly Lucien ("Lucien"), former Chief of the HNP, (e) Romaine Lestin ("Lestin"), former head of the HNP at the Port-au-Prince airport and, (f) Fourel Celestin ("Celestin"), former President of the Haitian Senate, head of the Lavalas political party and an advisor to Aristide.

108. At his February 2004 sentencing hearing, Bedouin Ketant ("Ketant"), a Haitian drug dealer and godfather of one of Aristide's daughters, admitted not only that he engaged in drug trafficking, but that he had paid bribes to Aristide to prevent his arrest and to otherwise protect him from arrest. Ketant stated in open court that: "everybody in Haiti in the business you have to pay -- Aristide demand and obtain payment. It's a one man show . . . . Either you pay him or you die." Ketant has specifically represented that he paid defendant Aristide and Aristide's former head of palace security, Oriel Jean, up to $500,000 per month to allow planes loaded with cocaine to land on National Route 9 near Port-au-Prince, and that he also made "massive payoffs" to Aristide affiliates Fanmi Lavalas and Fondation Aristide. Fondation

41

Aristide was a charity founded in 1996 by Aristide and others and used during Aristide's rule as a front for the laundering of public funds for the benefit of the Aristide Group.

109.    According to 1998 DEA testimony before the U.S. Congress, and confirmed during the hearing in the U.S. District Court for the Southern District of Florida at which Ketant entered a guilty plea to numerous counts of cocaine possession, trafficking and money laundering, Ketant, commencing in 1986, organized a broad transportation and distribution network that smuggled cocaine into the U.S. through Fort Lauderdale, Miami, West Palm Beach, New York and Chicago, utilizing a cadre of couriers traveling by commercial aircraft and vessel. According to the transcript of Ketant's plea hearing, between 1986 and 1996, Ketant and his conspirators in the U.S. and Haiti were responsible for the importation of over thirty thousand kilos of cocaine into the U.S. Ketant informed the Court at sentencing that defendant Aristide controlled 85 per cent of the cocaine flow through Haiti.

110.    Jean served as head of presidential/national palace security for defendant Aristide from 2001 to June 2003. While head of presidential/national palace security, Jean accepted large amounts of money in exchange for allowing cocaine shipments to pass safely through Haiti. In addition to receiving bribes from Ketant, Jean also received checks in amounts ranging from $5 to $10 million from presidential accounts, which funds on information and belief were used to pay for armed political gangs called "the Chimera," as well as propaganda and other activities for the benefit of defendant Aristide. Following defendant Aristide's departure from Haiti in February 2004, Jean fled to Canada where he was detained on immigration charges and ultimately surrendered to U.S. government officials. On May 28, 2005, Jean pled guilty to money laundering charges in the Southern District of Florida.

42

111.   On information and belief, from 1998 to 2004, Serge Edouard ("Edouard") headed a large-scale operation responsible for importing hundreds of pounds of cocaine from Colombia into Miami and New York.   On information and belief, Edouard worked with Stephanie Ambroise, the director of security for an airline at the Port-au-Prince airport, making two to three shipments of cocaine monthly to the U.S., for which Ambroise allegedly received $2 million per container.  Edouard was arrested in the Dominican Republic on April 15, 2005, and immediately deported to the United States.  On or about April 28, 2005, Edouard was indicted by a federal grand jury in the Southern District of Florida on money laundering and conspiracy to import cocaine charges.  Following a jury trial, Edouard was convicted of nine counts of money laundering, conspiracy to commit money laundering and conspiracy to import cocaine.  Edouard was sentenced to a life term in prison.

112.   Jean testified at the trial of Edouard that he and other Haitian law enforcement officials had received hundreds of thousands of dollars from Edouard to protect cocaine shipments.  Jean also testified that Aristide had approved a national security badge for Edouard that allowed Edouard to travel freely in the country without police searches, and that Edouard had given an unspecified amount of money to Fondation Aristide.

113.   Brillant, the former head of HNP anti-narcotic brigade, permitted a Colombian airplane carrying more than 1,000 kilos of cocaine to land on a highway near Port-au-Prince.  He was arrested in Haiti in May 2004 and deported to the United States.  On information and belief, Brillant, along with Jean, routinely accepted bribes in exchange for providing drug traffickers protection from arrest.  Therassan served as commander in chief of the HNP Brigade of Research and Investigation from April 2001 until approximately August 2003.  Therassan pled guilty on

43

April 20, 2005, in the U.S. District Court for the Southern District of Florida to accepting protection money from drug traffickers. On information and belief, Therassan assisted in the movement of between 100 and 150 kilograms of cocaine during the period from April 2000 to approximately February 2002 and received approximately $760,000 in bribe payments from drug traffickers.

114. Lucien, the former chief of the HNP, pled guilty to a money laundering charge in April 2005. Upon information and belief, Lucien was a member of Ketant's drug trafficking organization and assisted Ketant in coordinating and facilitating the arrival of drug shipments into Haiti that would then be smuggled into the United States. Lucien would instruct HNP officers to delay and divert DEA agents from the Port-au-Prince country office from interdicting drug shipments and, in return, received $50,000 and 5 kilograms of cocaine per shipment.

115. Lestin, the former head of the HNP at the International Airport in Port-au-Prince, was indicted jointly with Therassan and Lucien and pled guilty to one count of conspiracy to import cocaine in August 2005. On information and belief, Lestin accepted kickbacks to provide security for drug flights through Haiti's Port-au-Prince airport and shared the money with other HNP officers. Upon information and belief, Lestin was part of an organization that also included Ketant, Jude Perrin, head of the Haitian judicial police, and other Haitian police officials.

116. Fourel Celestin, a close advisor of Aristide who was a former president of the Haitian Senate and leader of the Lavalas party, pled guilty to one count of conspiracy to launder monetary instruments. Celestin managed the National Palace from October 1994 to February 1996 for Aristide. Upon information and belief, Celestin received tens of thousands of dollars in protection money to ensure the safe transport of shipments of cocaine through Haiti. Celestin

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

also allegedly hoarded cocaine shipments in his Jacmel home and himself directly engaged in narcotics trafficking.

## VI.    CLAIMS FOR RELIEF

### A.    First Claim for Relief: Damages for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1962(d) and 1964(c)

### (Plaintiffs Haiti and Teleco against All Defendants)

117.    Plaintiffs repeat and re-allege paragraphs 1 through 116 as set forth above.

118.    The Government of Haiti is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

119.    At all relevant times, the Government of Haiti was engaged in, or its activities affected, interstate or foreign commerce.

120.    Each of the defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

121.    Each of the defendants was at all times herein relevant employed by or associated with the Government of Haiti.

122.    Each of the defendants conducted or participated in the conduct of the affairs of the Government of Haiti through a pattern of racketeering activities, within the meaning of 18 U.S.C. § 1961(5), including violations of one or more of the following:

> (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud, in that defendants intentionally and repeatedly participated, directly and through their co-conspirators and others, in the above-described schemes to defraud Teleco, the Government of Haiti, and the people of Haiti of money and of the honest services of their public officials and used the wires in furtherance of their scheme. The Government and people of Haiti, and Teleco, reasonably relied to their detriment

45

on the above-described material misrepresentations and material omissions in executing the orders and requests of the defendants, in maintaining defendants in their positions of authority, and in foregoing other business, public service and investment opportunities. The plaintiffs suffered injury as a result of such reliance, and have incurred a specifiable amount of injuries to be proven at trial;

- (b) 18 U.S.C. § 1952, in that the defendants, both directly and through their co-conspirators and others, voluntarily used the wires and other facilities of interstate and foreign commerce, with the specific intent to promote, manage, carry on and facilitate the crime of bribery as defined by 15 U.S.C. §§ 78dd-2 and, thereafter, intentionally engaged, or attempted to engage, in one or more of the unlawful activities listed in 18 U.S.C. § 1952(b). With respect to the commission of bribery under 15 U.S.C. § 78dd-2 and 78dd-3, the defendants, both directly and through their co-conspirators and others, in order to obtain and retain business, corruptly and with wrongful and unlawful intent, made use of the mails, or other means and instrumentalities of interstate commerce in furtherance of payments, and/or promises of payment, of money to foreign officials for the purpose of (i) influencing the acts and decisions of such foreign officials in their official capacity, (ii) inducing such foreign officials to accomplish or fail to accomplish acts in violation of their lawful duties, and (iii) inducing such foreign officials to use their influence with the Government of Haiti, and the instrumentalities thereof, including Teleco, to affect and influence the acts and decisions of these governmental entities. The proscribed acts were committed in substantial part inside the United States.

(c) 18 U.S.C. § 1956, relating to money laundering, in that the defendants

46

intentionally and repeatedly conducted and attempted to conduct, directly and through their co-conspirators and others, the above-described financial transactions knowing that the transactions represented the proceeds of unlawful activity, when in fact the transactions did represent the proceeds of unlawful activity, and with an intent to promote the carrying on of the unlawful activity;

(d) 18 U.S.C. § 1957, relating to monetary transactions in certain property, in that the defendants knowingly and repeatedly engaged and/or attempted to engage, both directly and through their co-conspirators and others, in monetary transactions in criminally-derived property in excess of $10,000, which property has been derived from unlawful activity;

(e) 18 U.S.C. § 2314, in that defendants, as described above, repeatedly transferred, both directly and through their co-conspirators and others, in foreign commerce more than $5,000, knowing that such funds had been stolen, converted, or taken by fraud; and further engaging in such transactions as part of a scheme or artifice to defraud the Government and people of Haiti, and Teleco;

(f) 18 U.S.C. § 2315, in that defendants, both directly and through their co-conspirators and others, received, possessed, bartered and disposed of money in excess of $5,000, which money crossed a U.S. boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted or taken;

(g) 18 U.S.C. § 1503, relating to obstruction of justice, in that defendants, with a corrupt intent, both directly and through their co-conspirators and others,

47

endeavored to influence, obstruct and impede the due administration of justice by, among other things, destroying documents relating to the Teleco scheme, and on information and belief, the looting scheme, such destruction of evidence occurring shortly before and shortly after the end of Aristide's rule in 2004, with sufficient knowledge that they did foresee or should have foreseen that the natural and probable consequence of such scheme to destroy documents would obstruct the due administration of justice;

(h) Section 841 of the Controlled Substance Act, in that the defendants facilitated the distribution of, and conspired to possess and distribute, controlled substances as that term is defined in Section 893.13 of the Florida Statutes, including but not limited to cocaine, in, among other places, this judicial District.

123.    In violation of § 1962(d), each defendant conspired to violate § 1962(c) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of the Government of Haiti.

124.    The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

125.    The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

48

126.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of 18 U.S.C. § 1962(c) and § 1962(d) in an amount to be determined at trial and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

B.      **Second Claim for Relief: Damages for Violations of the Racketeer Influenced and Corrupt Organizations Act: 18 U.S.C. §§ 1962(c), 1962(d) and 1964(c)**

**(Plaintiffs Haiti and Teleco against All Defendants)**

127.    Plaintiffs repeat and re-allege paragraphs 1 through 126 as set forth above.

128.    At all times herein relevant, the following persons and other entities together constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) as "a union or group of individuals associated in fact although not a legal entity." They constituted an ongoing organization (the "Association-in-Fact") in which the various associates functioned as a continuing unit: (a) Aristide, (b) Gustave, (c) Deschineau, (d) Lavelanet, (e) Beliard, (f) Inevil, (g) Duperval, (h) Corr, (i) Mont Salem, (j) Céant, (k) Boyer, (l) Latouche, (m) Denis, (n) Debrosse, (o) Lebrun, (p) Saint-Jean, (q) Eddy Civil, (r) VJLS, (s) Se Pa'n, (t) Quisqueya, (u) Global Spectrum, (v) Fondation Aristide, (w) Lafanmi Lavalas, (x) Southborder, (y) All Trading Company, (z) Giovanna of Miami, (aa) Haffey Corp., (bb) Digitek, (cc) Michelle Cardozo, (dd) Ricardo Sanon, (ee) Tchakounté, (ff) Skyytel Ltd., (gg) IDT Corporation, (hh) Jean, (ii) Therassan, (jj) Lucien, (kk) Lestin, (ll) Celestin, (mm) Ketant, (nn) Edouard, (oo) Marie Alice Valin, and (pp) Sonia Jean-Louis.

129.    The Association-in-Fact identified in this Claim was engaged in, or its activities affected, interstate or foreign commerce.

49

130.     Each of the defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

131.     Each of the defendants was at all times herein relevant employed by or associated with the Association-in-Fact.

132.     Each of the defendants conducted or participated in the conduct of the affairs of the Association-in-Fact identified in this Claim through a pattern of racketeering activities, within the meaning of 18 U.S.C. § 1961(5), including violations of one or more of the following: (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud, (b) 18 U.S.C. § 1952, relating to interstate travel to carry on unlawful acts; (c) 18 U.S.C. § 1956, relating to money laundering, (d) 18 U.S.C. § 1957, relating to monetary transactions in certain property, (e) 18 U.S.C. § 2314 and 2315, relating to the transportation of stolen property, (f) 18 U.S.C. § 1503, relating to obstruction of justice; and (g) acts involving dealing in a controlled substance chargeable under state law.

133.     The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

134.     The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

135.     In violation of § 1962(d), each defendant conspired to violate § 1962(c) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct

50

of the affairs of the Association-in-Fact.

136.  Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of 18 U.S.C. § 1962(c) and § 1962(d) in an amount to be determined at trial and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

### C.      Third Claim for Relief: Damages For Violations Of the Racketeer Influenced and Corrupt Organizations Act: 18 U.S.C. §§ 1962(c), 1962(d) and 1964(c)

#### (Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)

137.  Plaintiffs repeat and re-allege paragraphs 1 through 136 as set forth above.

138.  Plaintiff Teleco is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

139.  At all relevant times, Teleco was engaged in, or its activities affected, interstate or foreign commerce.

140.  Each of the defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

141.  Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem was at all times herein relevant employed by or associated with Teleco.

142.  Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem conducted or participated in the conduct of the affairs of Teleco through a pattern of racketeering activities, within the meaning of 18 U.S.C. § 1961(5), including violations of one or more of the following:  (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud; (b) 18 U.S.C. § 1952, relating to interstate travel to carry on unlawful acts; (c) 18 U.S.C. § 1956, relating to money laundering; (d) 18 U.S.C. § 1957, relating to monetary transactions in certain property; (e) 18

51

U.S.C. § 2314 and 2315, relating to the transportation of stolen property; and (f) 18 U.S.C. § 1503, relating to obstruction of justice. The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

143.    The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

144.    In violation of § 1962(d), each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem conspired to violate § 1962(c) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of Teleco.

145.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of 18 U.S.C. § 1962(c) and § 1962(d) in an amount to be determined at trial and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

**D.    Fourth Claim for Relief: Damages for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a)**

**(Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)**

146.    Plaintiffs repeat and re-allege paragraphs 1 through 145 as set forth above.

147.    Plaintiff Teleco is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

52

148.    At all relevant times, Teleco was engaged in, or its activities affected, interstate or foreign commerce.

149.    Each of the defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

150.    Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem was at all times herein relevant employed by or associated with Teleco.

151.    Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem conducted or participated in the conduct of the affairs of Teleco through a pattern of racketeering activities, within the meaning of 18 U.S.C. § 1961(5), including violations of one or more of the following:  (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud, (b) 18 U.S.C. § 1952, relating to interstate travel to carry on unlawful acts; (c) 18 U.S.C. § 1956, relating to money laundering, (d) 18 U.S.C. § 1957, relating to monetary transactions in certain property, (e) 18 U.S.C. § 2314 and 2315, relating to the transportation of stolen property; and (f) 18 U.S.C. § 1503, relating to obstruction of justice. The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

152.    The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

153.    In violation of § 1962(a), each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem, upon receiving income derived from a pattern of racketeering

53

activity, used and invested a portion of such income in the operation of Teleco.

154.    The investment and use of this fraudulently obtained income injured the Plaintiffs by enabling each of the defendants to perpetuate the fraudulent operation of Teleco.

155.    Plaintiffs Haiti and  Teleco were injured in their business and property by reason of each defendant's violation of 18 U.S.C. § 1962(a) in an amount to be determined at trial and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

E.    **Fifth Claim for Relief: Damages for Violations of the Florida Racketeer Influenced and Corrupt Organizations Act, FLA. STAT. §§ 895.03(3), 895.03(4) and 772.104**

**(Plaintiffs Haiti and Teleco against All Defendants)**

156.    Plaintiffs repeat and re-allege paragraphs 1 through 155 as set forth above.

157.    The Government of Haiti is an "enterprise" within the meaning of FLA. STAT. § 895.02(3).

158.    At all relevant times, the Government of Haiti was engaged in, or its activities affected, interstate or foreign commerce.

159.    Each of the defendants is a "person," as the term is used in FLA. STAT. § 895.03(3).

160.    Each of the defendants was at all times herein relevant employed by or associated with the Government of Haiti.

161.    In violation of § 895.03(3), each of the defendants conducted or participated in the conduct of the affairs of the Government of Haiti through a pattern of racketeering activities,

54

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

within the meaning of FLA. STAT. § 895.02(4), including violations of one or more of the following:

(a)    FLA. STAT. § 817.034, relating to communications fraud, in that defendants, directly and through their co-conspirators and others, engaged in and furthered a systematic, ongoing course of conduct that intentionally defrauded and deprived Teleco, the Government of Haiti, and the people of Haiti, of money and of the honest services of their public officials by means of false pretenses and willful misrepresentation. The defendants each engaged in communications, as defined under Fla. Stat. § 817.034(3)(a), and used communications technology in furtherance of their scheme, which resulted in a permanent deprivation of the property and intangible rights of each of the plaintiffs to the improper benefit of the defendants and others. Teleco, along with the Government and people of Haiti, reasonably relied to its detriment on the above-described material misrepresentations and material omissions in executing the orders and requests of the defendants, in maintaining defendants in their positions of authority, and in foregoing other business, public service and investment opportunities. Each of the plaintiffs suffered injury as a result of such reliance, and have incurred a specifiable amount of injuries to be proven at trial;

(b)    FLA. STAT. § 812.014, relating to theft, in that defendants, directly and through their co-conspirators and others, knowingly obtained and used the property of Teleco, the Government of Haiti, and the people of Haiti, with intent to permanently deprive these parties of their rights to the property itself as well as

55

any benefits associated with it. Through these acts, the defendants, directly and through their co-conspirators and others, appropriated the plaintiffs' property to their own use and to the use of other persons not entitled to it.

(c)     FLA. STAT. § 896.101, relating to money laundering, in that the defendants intentionally and repeatedly conducted and attempted to conduct, directly and through their co-conspirators and others, the above-described financial transactions knowing that the property involved in such transactions represented the proceeds of unlawful activity, when in fact the transactions did involve the proceeds of unlawful activity, and with an intent to promote the carrying on of the unlawful activity. In addition, in some instances, the defendants, directly and through their co-conspirators and others, conducted and attempted to conduct the transactions described above knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of proceeds of the unlawful activity. The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

162.     The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

163.    In violation of § 895.03(4), each defendant conspired to violate § 895.03(3) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of the Government of Haiti.

164.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of FLA. STAT. § 895.03(3) and § 895.03(4) in an amount to be determined at trial and, pursuant to the civil remedy provisions of FLA. STAT. § 772.104, are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

F.      **Sixth Claim for Relief: Damages for Violations of the Florida Racketeer Influenced and Corrupt Organizations Act, FLA. STAT. §§ 895.03(3), 895.03(4) and 772.104**

**(Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)**

165.    Plaintiffs repeat and re-allege paragraphs 1 through 164 as set forth above.

166.    At all times herein relevant, the persons and other entities listed in paragraph 128 above together constituted an "enterprise" within the meaning of FLA. STAT. § 895.02(3) as a "union, association, or group of individuals associated in fact although not a legal entity." They constituted an ongoing organization (the "Association-in-Fact") in which the various associates functioned as a continuing unit.

167.    At all relevant times, the Association-in-Fact identified in this Claim was engaged in, or its activities affected, interstate or foreign commerce.

168.    Each of the defendants is a "person," as the term is used in FLA. STAT. § 895.03(3).

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

169.    Each of the defendants was at all times herein relevant employed by or associated with the Association-in-Fact.

170.    In violation of § 895.03(3), each of the defendants conducted or participated in the conduct of the affairs of the Association-in-Fact identified in this Claim through a pattern of racketeering activities, within the meaning of FLA. STAT. § 895.02(4), including violations of one or more of the following:  (a) FLA. STAT. § 817.034, relating to communications fraud; (b) FLA. STAT. § 812.014, relating to theft; and (c) FLA. STAT. § 896.101, relating to money laundering. The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

171.    The predicate acts alleged herein were executed in a continuous manner and the activities engaged in by the defendants constituted their regular manner of doing business. Accordingly, in some instances, the related activities of the defendants extended over a substantial period of time and, in the remaining instances, the activities constituted a specific threat of repetition extending indefinitely into the future.

172.    In violation of § 895.03(4), each defendant conspired to violate § 895.03(3) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of the Association-in-Fact identified in this Claim.

173.    Plaintiffs Haiti and Teleco was injured in its business and property by reason of each defendant's violation of FLA. STAT. § 895.03(3) and § 895.03(4) in an amount to be determined at trial and, pursuant to the civil remedy provisions of FLA. STAT. § 772.104, is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

and reasonable attorneys' fees.

G.    **Seventh Claim for Relief: Damages for Violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J. STAT. ANN. §§ 2C:41-2(a) and 2C:41-4(c).**

### (Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)

174.    Plaintiffs repeat and re-allege paragraphs 1 through 173 as set forth above.

175.    Teleco is an "enterprise" within the meaning of N.J. STAT. ANN. § 2C:41-1(c).

176.    At all relevant times, Teleco was engaged in, or its activities affected, interstate or foreign commerce.

177.    Each of the defendants is a "person," as defined by N.J. STAT. ANN. § 2C:41-1(b).

178.    Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem was at all times herein relevant employed by or associated with Teleco.

179.    Each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem conducted or participated in the conduct of the affairs of Teleco through a pattern of racketeering activities, within the meaning of N.J. STAT. ANN. § 2C:41-1(d), including violations of one or more of the following:

(a)    18 U.S.C. § 1343 and § 1346, relating to wire fraud, in that defendants intentionally and repeatedly participated, directly and through their co-conspirators and others, in the above-described schemes to defraud Teleco, the Government of Haiti, and the people of Haiti of money and of the honest services of their public officials and used the wires in furtherance of their scheme. The Government and people of Haiti, and Teleco, reasonably relied to their detriment on the above-described material misrepresentations and material

59

omissions in executing the orders and requests of the defendants, in maintaining defendants in their positions of authority, and in foregoing other business, public service and investment opportunities. The plaintiffs suffered injury as a result of such reliance, and have incurred a specifiable amount of injuries to be proven at trial;

(b) 18 U.S.C. § 1952, in that the defendants, both directly and through their co-conspirators and others, voluntarily used the wires and other facilities of interstate and foreign commerce, with the specific intent to promote, manage, carry on and facilitate the crime of bribery as defined by 15 U.S.C. §§ 78dd-2 and, thereafter, intentionally engaged, or attempted to engage, in one or more of the unlawful activities listed in 18 U.S.C. § 1952(b). With respect to the commission of bribery under 15 U.S.C. § 78dd-2 and 78dd-3, the defendants, both directly and through their co-conspirators and others, in order to obtain and retain business, corruptly and with wrongful and unlawful intent, made use of the mails, or other means and instrumentalities of interstate commerce in furtherance of payments, and/or promises of payment, of money to foreign officials for the purpose of: (i) influencing the acts and decisions of such foreign officials in their official capacity, (ii) inducing such foreign officials to accomplish or fail to accomplish acts in violation of their lawful duties, and (iii) inducing such foreign officials to use their influence with the Government of Haiti, and the instrumentalities thereof, to affect and influence the acts and decisions of these governmental entities. The proscribed acts were committed in substantial part inside the United

60

States.

(c) N.J. STAT. ANN. § 2C:20-3(a), relating to theft of movable property by an unlawful taking or disposition, in that defendants, directly and through their co-conspirators and others, knowingly and unlawfully took and/or exercised control over the property of Teleco, the Government of Haiti, and the people of Haiti, with intent to permanently deprive these parties of their rights to the property as well as any additional benefit that might be derived from such rights. Through these acts, the defendants, directly and through their co-conspirators and others, appropriated the plaintiffs' property to their own use and to the use of other persons not entitled to it.

(d) N.J. STAT. ANN. § 2C:20-4, relating to theft by deception, in that defendants, directly and through their co-conspirators and others, through purposeful acts of deception, obtained the property of Teleco, the Government of Haiti, and the people of Haiti, with intent to permanently deprive these parties of their rights to the property as well as any additional benefit that might be derived from such rights. Specifically, the defendants obtained the plaintiffs' property by: (i) purposely creating and/or reinforcing false impressions; (ii) purposely failing to correct such false impressions once they were established; and/or (iii) purposely failing to correct false impressions that the defendants knew to be influencing parties to whom they stood in a fiduciary or confidential relationship; namely, Teleco, the Government of Haiti, and the people of Haiti. Through these acts, the defendants, directly and through their co-conspirators and others, appropriated the

61

plaintiffs' property to their own use and to the use of other persons not entitled to it.

(e) N.J. STAT. ANN. § 2C:20-9, relating to theft by failure to make a required disposition of property received, in that defendants, directly and through their co-conspirators and others, purposely obtained or retained property, subject to a known legal obligation to make specified payments or other dispositions from such property, and thereafter dealt with the property obtained as their own and did not make the required payments or dispositions. Through these acts, the defendants, directly and through their co-conspirators and others, purposely appropriated the plaintiffs' property to their own use and to the use of other persons not entitled to it.

(f) N.J. STAT. ANN. § 2C:21-15, relating to the misapplication of entrusted property, in that defendants, directly and through their co-conspirators and others, applied and disposed of property entrusted to them as fiduciaries, and/or property belonging to the Haitian Government, in a manner which they knew to be unlawful and to involve a substantial risk of loss or detriment to the persons for whose benefit the property was entrusted; namely, Teleco, the Government of Haiti, and the people of Haiti.

180. In violation of N.J. STAT. ANN. § 2C:41-2(a), each of the defendants Aristide, Beliard, Inevil, Duperval, Corr and Mont Salem, upon receiving income derived from a pattern of racketeering activity, used and invested a portion of such income in the operation of Teleco.

181. The investment and use of this fraudulently obtained income injured Teleco by

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

enabling each of the defendants to perpetuate the fraudulent operation of Teleco.

182.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of N.J. STAT. ANN. § 2C:41-2(a) in an amount to be determined at trial and, pursuant to the civil remedy provisions of N.J. STAT. ANN. § 2C:41-4(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

**H.    Eighth Claim for Relief: Damages for Violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J. STAT. ANN. §§ 2C:41-2(c), 2C:41-2(d) and 2C:41-4(c).**

**(Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)**

183.    Plaintiffs repeat and re-allege paragraphs 1 through 182 as set forth above.

184.    Teleco is an "enterprise" within the meaning of N.J. STAT. ANN. § 2C:41-1(c).

185.    At all relevant times, Teleco was engaged in, or its activities affected, interstate or foreign commerce.

186.    Each of the defendants is a "person," as defined by N.J. STAT. ANN. § 2C:41-1(b).

187.    Each of the defendants was at all times herein relevant employed by or associated with Teleco.

188.    In violation of N.J. STAT. ANN. § 2C:41-2(c), each of the defendants conducted or participated in the conduct of the affairs of Teleco through a pattern of racketeering activities, within the meaning of N.J. STAT. ANN. § 2C:41-1(d), including violations of one or more of the following: (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud; (b) 18 U.S.C. § 1952, relating to interstate travel to carry on unlawful activity; (c) N.J. STAT. ANN. § 2C:20-3(a), relating to theft of movable property by an unlawful  taking or disposition; (d) N.J. STAT. ANN. §

63

2C:20-4, relating to theft by deception; (e) N.J. STAT. ANN. § 2C:20-9, relating to theft by failure to make a required disposition of property received; and (f) N.J. STAT. ANN. § 2C:21-15, relating to the misapplication of entrusted property.

189.    In violation of N.J. STAT. ANN. § 2C:41-2(d), each defendant conspired to violate N.J. STAT. ANN. § 2C:41-2(c) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of Teleco.

190.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of N.J. STAT. ANN. §§ 2C:41-2(c) and 2C:41-2(d), in an amount to be determined at trial and, pursuant to the civil remedy provisions of N.J. STAT. ANN. § 2C:41-4(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

**I.      Ninth Claim for Relief: Damages for Violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J. STAT. ANN. §§ 2C:41-2(c), 2C:41-2(d) and 2C:41-4(c).**

**(Plaintiffs Haiti and Teleco against Defendants Aristide, Beliard, Inevil, Duperval, Corr and Mount Salem)**

191.    Plaintiffs repeat and re-allege paragraphs 1 through 190 as set forth above.

192.    At all times herein relevant, the persons and other entities listed in paragraph 128 above together constituted an "enterprise" within the meaning of N.J. STAT. ANN. § 2C:41-1(c) as a "union, association, or group of individuals associated in fact although not a legal entity." They constituted an ongoing organization (the "Association-in-Fact") in which the various associates functioned as a continuing unit.

193.    At all relevant times, the Association-in-Fact identified in this Claim was engaged in, or its activities affected, interstate or  foreign commerce..

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

194.    Each of the defendants is a "person," as defined by N.J. STAT. ANN. § 2C:41-1(b).

195.    Each of the defendants was at all times herein relevant employed by or associated with the Association-in-Fact identified in this Claim.

196.    In violation of N.J. STAT. ANN. § 2C:41-2(c), each of the defendants conducted or participated in the conduct of the affairs of the Association-in-Fact identified in this Claim through a pattern of racketeering activities, within the meaning of N.J. STAT. ANN. § 2C:41-1(d), including violations of one or more of the following: (a) 18 U.S.C. § 1343 and § 1346, relating to wire fraud; (b) 18 U.S.C. § 1952, relating to interstate travel to carry on unlawful activity; (c) N.J. STAT. ANN. § 2C:20-3(a), relating to theft of movable property by an unlawful taking or disposition; (d) N.J. STAT. ANN. § 2C:20-4, relating to theft by deception; (e) N.J. STAT. ANN. § 2C:20-9, relating to theft by failure to make a required disposition of property received; and (f) N.J. STAT. ANN. § 2C:21-15, relating to the misapplication of entrusted property.

197.    In violation of N.J. STAT. ANN. § 2C:41-2(d), each defendant conspired to violate N.J. STAT. ANN. § 2C:41-2(c) by agreeing to the commission of acts constituting a pattern of racketeering activity in the conduct of the affairs of the Association-in-Fact identified in this Claim.

198.    Plaintiffs Haiti and Teleco were injured in their business and property by reason of each defendant's violation of N.J. STAT. ANN. §§ 2C:41-2(c) and 2C:41-2(d), in an amount to be determined at trial and, pursuant to the civil remedy provisions of N.J. STAT. ANN. § 2C:41-4(c), are thereby entitled to recover threefold the damages they have suffered, together with the costs of suit and reasonable attorneys' fees.

**J.      Tenth Claim for Relief: Accounting; Imposition of Constructive Trust and Equitable Lien.**

65

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

**(Plaintiffs Haiti and Teleco against All Defendants)**

199.     Plaintiffs repeat and re-allege paragraphs 1 through 198 as set forth above.

200.     Aristide and his associates acquired the confidence of Haiti and its people, and Teleco, and subsequently abused this trust by, *inter alia*, acquiring property rightfully belonging to Haiti and its people, and Teleco, through fraudulent means and disposing or transferring the property without authority.  During Aristide's rule over Haiti, Aristide, through the Office of the Presidency, controlled virtually all of the valuable assets of the Haitian government.   These assets included money and real and personal property owned by the Haitian government and the Central Bank, entitlements to foreign economic assistance, including assistance from the U.S.; the right to grant employment by the government of Haiti under Aristide; the right to decide who would do business with the Government of Haiti under Aristide; and the right to decide who could do business in Haiti, through the granting of licenses, concessions, permits, franchises, and monopolies.

201.     Aristide and his associates owed a fiduciary duty to Haiti and Teleco to hold and control these assets for the benefit of Haiti and Teleco, respectively, and not for their personal benefit or the personal benefit of their relatives, associates and accomplices.

202.     As alleged above, Aristide, aided and abetted by the other defendants, converted the assets of the Haitian government to their personal benefit and the personal benefit of their friends and associates.   They did so by looting money and property owned by the Haitian government, converting property belonging to Haiti and Teleco, diverting foreign economic assistance to which the Haitian government was entitled, and extorting, soliciting, and accepting bribes, kickbacks, gratuities, and commissions in exchange for the granting of government

66

employment, government contracts, and the legal right to do business in or with the Republic of Haiti and with Teleco. All such conversions of assets were done in violation of Aristide's duties to the beneficial owners of such assets, Haiti and Teleco. If Aristide and his associates are permitted to retain these assets, they will be unjustly enriched at plaintiffs' expense.

203. The defendants other than Aristide received (1) money and property stolen from the Haitian government and Teleco by Aristide and (2) other economic benefits taken or conferred upon them by Aristide in violation of their fiduciary duties. These defendants received such money, property and other economic benefits without giving value for them or with notice that such assets had been stolen or otherwise acquired in violation of Aristide's duties to Haiti and Teleco. If these defendants are permitted to retain such assets, they will be unjustly enriched at Plaintiffs' expense.

204. Aristide and his associates created and fostered a relationship of confidence and trust with the Government of Haiti and Teleco and thereafter abused this confidence and trust by, *inter alia*, engaging in a series of wrongful acts that resulted in a diversion of plaintiffs' property through fraudulent means, and the unjust enrichment of the defendants.

205. As a result of the foregoing, plaintiffs are entitled to an accounting by each of the defendants of all real and personal property held, acquired or disposed of by them at any time since January 1, 2001.

206. As a result of the foregoing, and in a manner consistent with adjudications in related proceedings, plaintiffs are entitled to a constructive trust and equitable lien upon all real and personal property of Aristide, wherever located worldwide, although it does not seek in this action such relief with respect to the real and personal property located in Haiti subject to

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

currently on-going judicial proceedings.

207.    The defendants regularly misused the corporate and governmental and other forms of business organization as a cloak for committing fraud and as a means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes used by defendants to conceal transfers of stolen money and property and to conceal ownership of such assets, it would be unjust and inequitable to require plaintiffs to trace the source of money used to acquire specific assets, or to prove that specific assets were acquired with money or property stolen from Haiti and Teleco.  Instead, the burden should be shifted to defendants to prove that they had sources of income other than the unlawful looting and investment schemes described herein, and to prove that particular assets were acquired by them with such independent, lawful income.

208.    As a result of the foregoing, and subject to the same exceptions set forth above in paragraph 206, plaintiffs are entitled to a constructive trust and an equitable lien upon all real and personal property of the other defendants, wherever located worldwide, received directly or indirectly from defendant Aristide or any of his agents, associates and accomplices.

K.    **Eleventh Claim for Relief: Damages for Breach of Fiduciary Duty.**

**(Plaintiffs Haiti and Teleco against Aristide, Gustave, Deschineau, Lavelanet, Inevil, and Duperval)**

209.    Plaintiffs repeat and re-allege paragraphs 1 through 208 as set forth above.

210.    As alleged above, defendants Aristide, Gustave, Deschineau, Lavelanet, Inevil, and Duperval owed a fiduciary duty to Haiti and its people to hold and control the assets of the Haitian government for the benefit of Haiti and its people, and not for their personal benefit or the personal benefit of their relatives, associates and accomplices.  Defendants Aristide, Inevil, Duperval also owed a fiduciary duty to Teleco   to conduct its affairs for the benefit of Teleco,

68

and not for their personal benefit or the personal benefit of their relatives, associates and accomplices.

211.    By engaging in the acts alleged above, defendants Aristide, Gustave, Deschineau, Lavelanet, Inevil, and Duperval breached their fiduciary duties to Haiti and its people, and to Teleco.  As a direct and proximate result of such breaches, plaintiffs Haiti and Teleco have suffered damages in an amount to be determined at trial.

212.    In committing the acts and perpetrating the schemes alleged herein, defendants Aristide, Gustave, Deschineau, Lavelanet, Inevil, and Duperval intended to injure plaintiffs Haiti and Teleco and acted with malice and oppression and with a willful and conscious disregard for plaintiffs' rights.  In so doing said defendants have acted toward plaintiffs in such manner as to warrant disgorgement of their uses and investments of plaintiffs' money and property together with an award of punitive and exemplary damages in an amount to be determined at trial.

## L.    Twelfth Claim for Relief:  Damages for Conversion and Conspiracy to Convert (Plaintiffs Haiti and Teleco against All Defendants)

213.    Plaintiffs repeat and re-allege paragraphs 1 through 212 as set forth above.

214.    Defendants, and each of them, have wrongfully taken, or aided and abetted the wrongful taking of money, funds and other personal property from its rightful owners, namely the Government of Haiti and its people, with the intent to convert the property for their own use or otherwise exercise an ownership in the property that was and is inconsistent with the true owners' right of possession.  Such conversions have been for the benefit of defendants and their families and associates, and to the detriment of the true owners of the property, the Government of Haiti and its people.

69

215.   Such acts of conversion are chargeable to defendants described therein above as having committed said acts.

216.   Defendants unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together, with each other and with others to injure and inflict a wrong against the Government of Haiti and its people by, among other things, converting money, funds, and property rightfully belonging to Haiti and its people to their own use, and to the use of their associates.  Each defendant understood, accepted and agreed to the general objectives of the conspiracy described herein, either explicitly or implicitly, and each defendant took steps in furtherance of the conspiracy and to effect the objects thereof.  Specifically the defendants committed the overt acts referenced above, among others, with the intent of effecting the general objectives.

217.   As a direct and proximate result of acts of conversion by defendants, plaintiff has suffered damages in an amount to be determined at trial.

218.   In committing the acts and perpetrating the schemes alleged herein, defendants intended to injure plaintiff and acted with malice and oppression and with willful and conscious disregard for plaintiff's rights. In so doing defendant Aristide has acted toward plaintiff in such manner as to warrant disgorgement of his uses and investments of plaintiff's money and property together with an award of punitive and exemplary damages in an amount to be determined at trial.

**M.    Thirteenth Claim for Relief:  Damages for Fraud and Deceit and Conspiracy to Defraud**

**(Plaintiffs Haiti and Teleco against All Defendants)**

219.   Plaintiffs repeat and re-allege   paragraphs 1 through 218 as set forth above.

70

220.    In the course of conducting and participating in the conduct of the affairs of the respective enterprises described above, defendants made representations to the plaintiffs and others, which representations were false and necessary to these defendants' ability to implement the unlawful looting, laundering, investment and obstruction schemes described.  Defendants, directly or through their co-conspirators, made these representations despite full and contemporaneous knowledge of their falsity and with the intent of inducing the Government of Haiti and Teleco to act in reliance thereon.  The Government of Haiti, and its people and agents, and Teleco and its agents, took action in reliance on the correctness of the defendants' misrepresentations of fact and suffered injury as a direct result of such action.

221.    As described above, defendants failed to disclose and otherwise concealed from plaintiffs and others facts the disclosure of which was necessary to make the representations made by them to plaintiffs not materially misleading.  The defendants knew that said facts were not being disclosed and were material, and they intended by concealment of these facts to facilitate continuation of their unlawful diversion of assets belonging to Haiti and its people, and to Teleco.

222.    Plaintiffs relied to their detriment on the representations of integrity by defendant Aristide and his associates and co-conspirators.  Aristide and his associates and co-conspirators flagrantly breached the trust and confidence of the plaintiffs by committing numerous acts of fraud, deceit, conversion and racketeering alleged in this Complaint through which they plundered the assets of Haiti and diverted the assets of Teleco.

223.    In the course of developing their elaborate scheme to defraud, defendant Aristide secured the assistance, among others, of defendants Gustave, Deschineau, Lavelanet, Inevil,

71

Duperval, Corr, Beliard and Mont Salem who with Aristide unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together, with each other and with others to injure and inflict a wrong against Haiti and its people, and against Teleco, by facilitating, aiding and abetting, and concealing the scheme and artifice to. defraud, and to obtain money and property by false representations and promises, thereby enabling the massive diversions and concealment of looted funds identified in this Complaint. Each defendant identified in this paragraph understood, accepted and agreed to the general objectives of the conspiracy to defraud described herein, either explicitly or implicitly, and each took steps in furtherance of the conspiracy and to effect the objects thereof. Specifically the Defendants committed the overt acts referenced above, among others, with the intent of effecting the general objectives.

224. As a direct and proximate result of the foregoing fraudulent conduct and conspiracy to defraud, plaintiffs have suffered damages in an amount to be determined at trial.

225. In committing the acts and perpetrating the schemes alleged herein, defendant Aristide intended to injure plaintiffs and acted with malice and oppression and with willful and conscious disregard for plaintiffs' rights. In so doing defendants have acted toward plaintiffs in such manner as to warrant disgorgement of their uses and investments of plaintiffs' money and property together with an award of punitive and exemplary damages in an amount to be determined at trial.

WHEREFORE, plaintiffs THE REPUBLIC OF HAITI and TELECO pray for Judgment against defendants as follows:

1. On the First, Second, Third, Fourth, Fifth, and Sixth Claims for Relief:

      (a) For compensatory damages according to proof, trebled pursuant to law;

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

2. On the Seventh, Eighth, and Ninth Claims for Relief:

    (a) For treble actual damages, attorneys fees, costs of litigation and prejudgment interest on actual damages.

3. On the Tenth Claim for Relief:

    (a) For an accounting by the defendants with respect to real and personal property held or disposed by them at any time since January 1, 2001;

    (b) For imposition by the Court in a manner consistent with adjudications in related proceedings, of a constructive trust and equitable lien for the benefit and in favor of the Republic of Haiti and Teleco with respect to the real and personal property of Aristide wherever located worldwide, except for the real and personal property located in Haiti that is subject to currently on-going judicial proceedings;

    (c) For imposition of a constructive trust and an equitable lien in similar manner for the benefit and in favor of the Republic of Haiti and Teleco upon all the real and personal property of the other defendants, wherever located worldwide, except for the real and personal property located in Haiti that is subject to currently on-going judicial proceedings, received, directly or indirectly, from Aristide or any of their agents, associates or accomplices;

3. On the Eleventh, Twelfth, and Thirteenth Claims for Relief:

    (a) For compensatory damages according to proof; and

    (b) For punitive and exemplary damages as awarded by the jury;

4. On All Claims for Relief:

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

(a)   For reasonable attorneys' fees;

(b)   For costs of suit incurred herein; and

(c)   For such other and further relief as the Court may deem just and proper in the circumstances.

Respectfully submitted,

Mitchell S. Fuerst
Fla. Bar No. 264598
RODRIGUEZ, O'DONNELL, ROSS,
    FUERST
1001 Brickell Bay Drive, Suite 2002
Miami, Florida  33131

Marc S. Palay
Eric W. Bloom
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 282-5000
Fax:  (202) 282-5100

Jerome W. Pope
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-5600
Fax:  (312)-558-5700

74

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

05- 22852
CIV-COOKE

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

The Republic of Haiti and Telecommunications D'Haiti S.A.M.

## DEFENDANTS

Jean-Bertrand Aristide, Faubert Gustave, Rodnee Deschineau, et. al.

**(b)** County of Residence of First Listed Plaintiff   Haiti
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   South Africa
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Mitchell S. Fuerst, Esq., 1001 Brickell Bay Drive, Stu. 2002, Miami, Florida
33131 (305) 350-5699; Eric W. Bloom, Esq., Winston & Strawn, LLP., 1700 K
Street N.W., Washington D.C. 20006 (202) 282-5000; Jerome W. Pope, Esq.,
Winston & Strawn,35 W. Wacker Drive, Chicago, Il 60601 (312) 558-5600

Attorneys (If Known)

Unknown

MAGISTRATE JUDGE
BROWN

**(d)** Check County Where Action Arose ☒ DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity)

18 U.S.C. 1962 (a); 18 U.S.C. 1962 (c); 18 U.S.C. 1962 (d)

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE                           DOCKET NUMBER

DATE
11/02/2005

SIGNATURE OF ATTORNEY OF RECORD
Mitchell S Fuerst, Esq.

FOR OFFICE USE ONLY

RECEIPT # 129867  AMOUNT 250 —   APPLYING IFP